**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MELISA SUSAN KYLE,**<br><br>**Defendant.** | **Case No. 26-CR-189-SEH** |

## OPPOSED MOTION TO SUPPRESS

Melisa Kyle, by and through counsel, moves the Court to suppress all evidence obtained on May 10, 2026, pursuant to Fed. R. Crim. P. 12(b)(3)(C). The Automated License Plate Reader ("ALPR") search, traffic stop, and detention after completion of the traffic stop employed in obtaining this evidence were conducted in violation of Ms. Kyle's Fourth Amendment rights. The Government objects to the relief requested. In support of this motion, Counsel for Ms. Kyle submits:

## FACTUAL BACKGROUND

On May 10, 2026, at around 6:17 p.m., Tulsa County Sheriff's Deputy Freddie Solorio Alaniz ("Alaniz") noted a black SUV with a California license plate travelling east on I-44 in eastern Tulsa. Ex. 1 at Bates 117. Alaniz searched the vehicle license plate using two automated license plate reader ("ALPR") databases: Flock[1] and Vehicle Manager[2]. *Id*. Counsel for the Government has informed undersigned Counsel that Alaniz input the SUV's license plate and state as search terms in both the Flock and Vehicle Manger systems. Ex. 2. The reasons indicated for the searches were "traffic violation" and "investigation," respectively. *Id.* Based on the results of

[1] *See* https://flocksafety-staging.webflow.io/products/flock-safety-platform
[2] *See* https://www.motorolasolutions.com/en_xl/video-security-access-control/license-plate-recognition-camera-systems/vigilant-vehiclemanager-lpr-analytics-software.html

these searches revealed the vehicle's travel to California and recent return to the area, Alaniz pulled behind the SUV. Ex. 1 at Bates 117*; see also*, Ex. 3 (Flock Safety report) and 4 (Vehicle Manager report). He then followed the SUV until it allegedly failed to properly signal before changing lanes and followed another vehicle too closely. Ex. 1 at Bates 117; *see also*, Ex. 5 at 18:19:09-18:19:56.[3] After activating his vehicle emergency lights, Alaniz stopped the SUV. Ex. 1, at Bates 117.

Once stopped, Alaniz approached the passenger side of the vehicle and spoke to the only occupant, Defendant Melisa Kyle. Ex 6 at 18:20:41. Alaniz informed Ms. Kyle that he stopped her for improperly changing lanes. *Id*. at 18:21:00. On request, Ms. Kyle immediately provided her identification documentation as requested but she could not find the rental agreement for the vehicle. *Id*. at 18:21:22-18:22:00. Ms. Kyle answered Alaniz's questions about her travel and stated she had rented the vehicle over a month before. *Id*. at 18:23:08. Alaniz asked Ms. Kyle to accompany him to his patrol car so she could continue to search for the rental agreement on her phone while he prepared the warning citation. *Id*. at 18:23:26-18:23:31. Alaniz kept Ms. Kyle in his patrol vehicle for the remainder of the stop. At no time did he advise her that she could leave or return to her own car.

Seated in the patrol vehicle, Alaniz continued to ask Ms. Kyle about her travel. He asked Ms. Kyle if she was returning from California. *Id.* at 18:24:20. Ms. Kyle replied she had been there for a couple of days, but she was now going home, excited to see her kids. *Id.* at 18:24:24. Alaniz asked follow-up questions about her travel. *Id.* at 18:24:31. When Alaniz asked Ms. Kyle what day she left Missouri, she was initially unsure before remembering she left on a Wednesday. *Id* at 18:26:10. Alaniz then asked Ms. Kyle about the amount of luggage she had with her if her trip to

---

[3] All video exhibits provided include original date and timestamps in the upper right-hand corner. These timestamps are in HH:MM:SS format. References to specific times in these exhibits are made using this format throughout this Motion.

California was only for two days. *Id.* at 18:26:28-18:26:30. Ms. Kyle responded she picked up stuff for her kids and had purchased additional luggage to transport it. *Id.* at 18:26:37-18:26:46. Alaniz continued to ask about her travel, kids, and employment while Ms. Kyle located her rental agreement on her phone and he completed the paperwork for the traffic warning. *Id.* at 18:26:48-18:27:04.

After handing the traffic warning and identification to Ms. Kyle, Alaniz asked if she had time to answer more questions. *Id.* at 18:36:55-18:36:58. After she agreed, Alaniz explained his job and, according to his training and experience, people who travel to California and come right back are usually transporting drugs. *Id.* at 18:37:00-18:37:51. Alaniz then asked Ms. Kyle for consent to search her car. Ms. Kyle refused and stated she did not see why the search would be necessary. *Id.* at 18:37:52-18:37:56. Alaniz responded, "I just told you why" and radioed for backup. *Id.* at 18:37:57-18:38:04. Alaniz then informed Ms. Kyle she was detained and not free to leave. *Id.* at 18:38:05-18:38:11.

During this second detention Alaniz conducted a drug dog open-air sniff outside the vehicle and then searched the vehicle's interior and contents. Ex. 1 at Bates 120. The narcotics found in that search are the basis for the present Indictment. While detained this second time, Ms. Kyle admitted she possessed a little marijuana. Ex. 6 at 18:38:39-18:38:40. Ms. Kyle's inculpatory statements after Alaniz informed her that she was detained and all evidence seized in the search should be suppressed as they were obtained in violation of the Fourth Amendment.

## AUTHORITY AND ARGUMENT

The Fourth Amendment protects the right of the people to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. "It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se

unreasonable." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). "The government bears the burden of proof to justify warrantless searches and seizures." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). Under Fourth Amendment jurisprudence, the driver of a rental car has a reasonable expectation of privacy in that vehicle. *Terrence Byrd v. United States*, 584 U.S. 395 (2018).

Tulsa County Sheriff's Deputy Alaniz conducted a warrantless ALPR database search before deciding to follow her. Alaniz then initiated a traffic stop without probable cause. After completing the objective of the illegal traffic stop, Alaniz extended the detention of Ms. Kyle without reasonable suspicion to search her car. These seizures and searches violated the Fourth Amendment; any evidence, physical or verbal, obtained as a result should be suppressed.

**I. The traffic stop was an illegal seizure under the Fourth Amendment at its inception.**

The Supreme Court recognizes three types of police-public encounters: arrests, investigative stops, and consensual encounters. *United States v. Jones*, 701 F.3d 1300, 1312 (10th Cir. 2012). "[A] routine traffic stop is more analogous to an investigative detention than a custodial arrest." *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001) (citing *United Staes v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998)). "We therefore analyze such stops under the principles developed for investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1[] (1968)." *Id.* To be reasonable at its inception, a traffic stop only requires a "minimal level of *objective* justification." *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006) (emphasis added) (quoting *United States v. Dennison*, 410 F.3d 1203, 1207 (10th Cir. 2005)).

***a. Alaniz impermissibly targeted Ms. Kyle based on her interstate travel.***

Before pulling his patrol vehicle into traffic to follow Ms. Kyle's SUV, Alaniz had searched two ALRP databases for the license plate. Ex. 1 at Bates 117. Although he had not

observed the SUV violating any traffic laws, Alaniz indicated in one system that the purpose of the search was "traffic violation." Ex. 2, 3 (Flock Safety report), and 4 (Vehicle Manager report). The search results did not indicate the vehicle was stolen or otherwise associated with suspected criminal activity. However, Alaniz decided it was notable "that the vehicle appeared to have made a very quick turnaround travel to the western part of the country and was now returning back." Ex. 1 at Bates 117. Based on his "training and experience that criminals involved with transporting illegal narcotics often make very short turn around trips to source cities such as Los Angeles, Ca area, Phoenix, Az and Albuquerque, Nm" Alaniz decided to follow the SUV. *Id*.

Alaniz targeted Ms. Kyle based upon her having an out-of-state license plate and the search results that showed she had travelled to places he considered "drug sources." *Id*. This conduct contravenes Tenth Circuit precedent. In *Vasquez v. Lewis,* the Tenth Circuit observed that such reasoning would "justify the search and seizure of the citizens of more than half of the states in our country" and commanded that it was "time to stop the practice of detention of motorists for nothing more than an out-of-state license plate." 834 F.3d 1132, 1138 (10th Cir. 2016). The Circuit confirmed its commitment to this principle in *Shaw v. Smith*, when it held that the Kansas Highway Patrol had been violating the Constitution by failing to modify its training materials consistent with *Vasquez*. 166 F.4d 61, 81-82 (10th Cir. 2026). Alaniz's reliance on Ms. Kyle's out-of-state license plate and interstate travel is analogous to the behavior that the Tenth Circuit found unconstitutional in *Shaw v. Smith*. Therefore, his observations regarding her travel or license plate cannot permissibly support the traffic stop, or the post-traffic stop detention and search in this case.

***b. Objectively, no traffic violation occurred to justify the traffic stop.***

A traffic stop is valid when based on an observed traffic violation. *United States v. Herrera*, 444 F.3d 1238, 1242 (10th Cir. 2006). According to Alaniz's report, he initiated the traffic stop

based on Ms. Kyle's SUV failing to signal 100 feet before making a lane change. Ex. 1, at Bates 117. However, the dash camera footage tells a different story. For the benefit of this Court's review, counsel for Ms. Kyle has slowed the first portion of the dash camera video. *See* Ex. 7.

Like all states, Oklahoma has adopted the Federal Highway Administration's Manual on Uniform Traffic Control Devices ("MUTCD"). Ex. 8 at page 4, Section 1B.02. Relevant to this issue is the MUTCD standardizes markings for roads and highways. These standards provide the broken white lines between lanes travelling in the same direction should be ten feet in length thirty-foot gaps between, or dimensions with a similar ratio of line segments to gaps. *Id*. at page 538, Section 3A.04. Utilizing Google Maps and Google Earth Pro, the distance from the beginning of one broken white line to the farthest point of a third broken white line on the roadway is approximately 100.15 ft. The aerial image of the roadway shows the line and gap segments to follow MUTCD standards.[4] *See* Ex 9 and 10.

With these distances in mind, the video shows after Ms. Kyle activated her signal the first time, she passed at least 3 broken white lines after activating the SUV's signal and before she moved into the next lane. Ex. 7 at 18:19:35 and 18:19:39. This distance far exceeds the 100 feet required by Oklahoma State law. *See* Ex. 9 and 10. The second time the signal is activated, the SUV again passes more than 3 broken white lines before changing lanes. Ex. 7 at 18:19:43 and 18:19:48. When the car that Ms. Kyle pulled behind is visible, the position of the two vehicles, relative to the broken white lines indicates they are, at minimum, a car's length apart and at a distance comparable to that which Alaniz was following Ms. Kyle. *Id*. 18:19:49-18:19:50. Finally, after initiating her signal a third time, Ms. Kyle again passed at least three broken white lines

[4] Investigators from the Federal Public Defender's Office confirmed the accuracy of these distances by taking physical measurements at the location of the traffic stop.

before changing lanes. *Id*. 18:19:54 and 18:19:56.

A vehicle traveling at 55 mph will travel 100 feet in approximately 1.24 seconds. Each time Ms. Kyle initiates her signal, at least 2 seconds pass while she maintained her current lane and before her vehicle crossed into the next lane. A vehicle moving at 55 mph will travel slightly over 161 feet in two seconds, over 50% farther than the required minimum distance.

Ms. Kyle's speed during these lane changes can be gauged using Alaniz's dash and body camera videos. Ex. 5 and 6. When Alaniz's body camera begins recording, he is already following Ms. Kyle's vehicle. *Compare* Ex. 5 at 18:19:11 and Ex. 6 at 18:19:32. His vehicle's speedometer is visible during the lane changes on the body camera. Ex. 6 at 18:19:32 - 18:19:56. It is apparent from the dash camera that Alaniz followed Ms. Kyle at a speed consistent with her SUV throughout the alleged traffic violation. Ex. 5 at 18:19:32-18:19:56. The first lane change occurs between 18:19:35 and 18:19:39. *Id*. at 18:19:35 - 18:19:39. Alaniz's speedometer fluctuates between 59 and 61 mph for an average speed of 60 mph. Ex. 6 at 18:19:35 - 18:19:39. This average speed is approximately 88 feet per second. Therefore, in the 2 seconds that elapsed after Ms. Kyle signaled before crossing into the next lane, her vehicle travelled approximately 176 feet.

The second lane change occurred between 18:19:43 and 18:19:48. Ex. 5 at 18:19:43 - 18:19:48. During this period, Alaniz's speedometer is shown slowing from 60 mph to 54 mph. Ex. 6 at 18:19:43 - 18:19:48. This results in an average speed of 57 mph which is approximately 83.62 feet per second. Again, Ms. Kyle signaled 2 seconds before crossing into the next lane. At 57 mph, her vehicle travelled approximately 167 feet before changing lanes. The third and final lane change occurred between 18:19:54 and 18:19:56 when Alaniz activated his emergency lights. Ex. 5 at 18:19:54 - 18:19:56. Alaniz's speed begins at 53 mph and climbs to 56 mph by the time he initiates the traffic stop. Ex. 6 at 18:19:54 - 18:19:56. This is an average speed of 54.5 mph or 79.95 feet

per second. At this speed, Ms. Kyle's vehicle travelled approximately 159.9 feet in the 2 seconds that her signal was active before she moved into the next lane.

While an officer's mistake of fact may support probable cause to justify a traffic stop, the mistake must be objectively reasonable. *Herrera*, 444 F.3d at 1246. It is clear here that Ms. Kyle properly signaled before changing lanes and therefore did not violate any traffic laws. Given Alaniz's training and experience, it is objectively unreasonable for him to have been mistaken. Considering that no traffic violation occurred, the traffic stop initiated by Alaniz was unlawful at its inception.

**II. Ms. Kyle was illegally detained after the completion of the traffic stop.**

Should this Court find the traffic stop was lawful at its inception, it should nonetheless find the mission of the traffic stop was complete when Alaniz returned Ms. Kyle's paperwork to her with a copy of the traffic warning only to unlawfully detain her when she did not consent to a search of her vehicle.

An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information." *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). The scope and the actions of officers during the detention must reasonably related to underlying justification. *United States v. McSwain*, 29 F.3d 558, 561 (10th Cir. 1994). Continued detention after any reasonable suspicion is dispelled "exceed(s) the limits of a lawful investigative detention and violate(s) the Fourth Amendment." *Id*. at 561-62.

Investigative detentions must satisfy two prongs to constitute a "reasonable" "seizure" under the Fourth Amendment. First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity[,]" in other words, "reasonable

suspicion." *Oliver*, 209 F.3d at 1186 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Second, the investigative detention following the stop must be "reasonably related in scope to the circumstances" that justified the stop. *Terry*, 392 U.S. at 20.

A seizure occurs where "a reasonable person would [not] feel free 'to disregard the police and go about h[er] business[.]'" *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). An officer's authority to seize the occupants of a vehicle ends when "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). A suspect's refusal to consent to a search does not contribute to a reasonable suspicion necessary to continue to detain a suspect. *See United States v. Santos*, 403 F.3d 1120, 1126 (10th Cir. 2005) "(If refusal of consent were a basis for reasonable suspicion, nothing would be left of Fourth Amendment protections."); *see also Hunnicutt*, 135 F.3d at 1350 ("Mr. Hunnicutt asserts that his refusal to consent to search should not have been used to contribute to the officer's suspicions. We agree[.]").

Ms. Kyle was subjected to an illegal seizure after the traffic stop was completed, therefore, all evidence and statements derived from the seizure and search that followed should be suppressed.

**1. *Alaniz lacked reasonable suspicion to detain Ms. Kyle after completing the traffic stop.***

The initial stop was completed when Alaniz handed Ms. Kyle her license and the traffic warning. Alaniz seized Ms. Kyle again after she denied consent to search her vehicle. Ms. Kyle initially consented to answer further questions, but her refusal to consent to the search of her vehicle, which was well within her right to exercise, ended her consent to escalate the interaction. Without continued consent, Alaniz had no authority to detain Ms. Kyle absent reasonable suspicion that criminal activity was afoot.

"Reasonable suspicion requires a particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022) (internal quotation omitted). Reasonable suspicion cannot be based only on a hunch. *Id*. Alaniz lacked a "particularized and objective basis" under the totality of the circumstances to detain Ms. Kyle after completing the traffic stop. According to his Report, Alaniz relied upon the following to justify his detention of Ms. Kyle after the completion of the traffic stop: 1) her travel plans, 2) the amount of luggage in her vehicle, 3) her nervousness, and 4) her refusal to consent to a search of her vehicle. Ex. 1. Combined under the totality of the circumstances test, these innocuous factors are insufficient to establish reasonable suspicion as required to detain Ms. Kyle beyond the initial traffic stop. Although courts are not to assess each factor in isolation, they are addressed in turn below for clarity.

***a) Ms. Kyle's travel plans did not contribute to establishing reasonable suspicion*.**

Traveling to California for only a couple of days may have seemed implausible to Alaniz, but the 10th Circuit has "been reluctant to deem travel plans implausible— and hence a factor supporting reasonable suspicion— where the plan is simply unusual or strange because it indicates a choice that the . . . officer would not make." *Leon*, 80 F.4th at 1166; *see also United States v. Lopez*, 849 F.3d 921, 927 (10th Cir. 2017) ("[W]e have generally been reluctant to give weight in the reasonable-suspicion analysis to unusual travel purposes, at least absent lies, inconsistencies, or the like.").

Ms. Kyle informed Alaniz she was coming from California, she had been gone for 6 days and had stayed in California for a couple of nights. When asked about the long drive for such a short stay, Ms. Kyle responded the drive was as fulfilling as the destination. Ex. 6 at 18:29:43-

18:29:51. Her response is consistent with Americans' tradition of road trips.[5] Alaniz's observation that he believed "that a one day travel halfway across the country was not a normal travel" is neither reasonable or objective and does not support a finding Ms. Kyle's travel plans contribute to the reasonable suspicion calculous.

Alaniz also relies heavily on California being a known drug source. Ex. 6 at 17:38-17:52, Ex. 1 at Bates 120. However, the Tenth Circuit has rejected such observations as a basis for reasonable suspicion holding "the fact that the defendants were traveling from a drug source city . . . or a drug source state – does little to add to the overall calculus of suspicion." *United States v. Guerrero*, 472 F.3d 784, 787-88 (10th Cir. 2007). "Because law enforcement officers have offered countless cities as drug source cities and countless others as distribution cities, however, the probativeness of a particular defendant's route is minimal." *United States v. White*, 584 F.3d 935, 951-952 (10th Cir. 2009). The Tenth Circuit has condemned the logic employed by Alaniz stating: "[i]t is time to stop the practice of detention of motorists for nothing more than an out-of-state license plate." *Vasquez v. Lewis*, 834 F.3d 1132, 1138 (10th Cir. 2016). In January 2026, the Tenth Circuit again confirmed its condemnation of targeting out of state drivers as Alaniz did in *Shaw v. Smith* stating, "the fact that the State from which a vehicle has traveled is a drug-source or that the destination of the vehicle is a drug-destination State should not be considered in determining whether to stop or detain a vehicle." 166 F.4th 51, 81 (10th Cir. 2026).

This Court should find Ms. Kyle's interstate travel lends no weight to reasonable suspicion.

---

[5] For example, in celebration of the country's 250th anniversary, the Federal Department of Transportation has promoted "The Great American Road Trip" to residents. (https://greatamericanroadtrip.org/ (last visited on July 8, 2026)) and international tourists as well (https://www.visittheusa.com/road-trips/ .(last visited on July 8, 2026)).

***b) The amount of luggage in Ms. Kyle's vehicle did not contribute to establishing reasonable suspicion.***

When the amount of luggage observed in a vehicle is consistent with stated travel plans, it must be given only the slightest weight. In *Karam,* an officer observed little luggage in Karam's vehicle. *United States v. Karam*, 496 F.3d 1157, 1159 (10th Cir. 2007) (luggage described by officer as a "carry-on bag"). When the defendant informed the officer that he was on a one-and-one-half week trip, the officer concluded this scant amount of luggage was suspicious. *Id.* at 1162. However, the Tenth Circuit held the amount of luggage is a fact "so innocuous and so susceptible to varying interpretations" it contributes little or no weight to reasonable suspicion. *Id.* at 1163 (quoting *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997)); *see also United States v. Kaguras*, 183 F.App'x 783, 789 (10th Cir. 2006) (unpublished) (finding no basis for trooper to regard the amount luggage as suspicious given stated travel plans). Here, Ms. Kyle stated she had driven to California where she stayed for a couple of days. She further stated she picked up stuff for her kids while there and purchased a suitcase. As the amount of luggage Ms. Kyle had been consistent with her travel plans, this factor adds no support to finding reasonable suspicion to detain her beyond the completion of the traffic stop.

This Court should find the amount of luggage in Ms. Kyle's vehicle adds nothing to the reasonable suspicion calculus.

***c) Ms. Kyle's nervousness was objectively not extreme or persistent to contribute to establishing reasonable suspicion.***

"Ordinary nervousness bears little weight in the reasonable suspicion calculus." *United States v. Leon*, 80 F.4th 1160, 1167 (10th Cir. 2023) (citing *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010)). "This is because most motorists experience some degree of

nervousness when stopped by police." *Id.* The government's repetitive reliance on . . . nervousness . . . as a basis for reasonable suspicion . . . must be treated with caution." *Vasquez*, 834 F.3d at 1138 (citing *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997) (alterations in the original)). Extreme and persistent nervousness is given more weight, however, the Tenth Circuit looks "for specific indicia that the defendant's nervousness was extreme, rather than credit[ing] an officer's naked assertion." *Leon*, 80 F.4th at 1167 (quoting *Simpson*, 609 F.3d at 1148). Here, Alaniz states in his report Ms. Kyle "was very nervous" and her hands were "shaking uncontrollably." Ex. 1, at Bates 118. He noted Ms. Kyle would take deep breaths and exhale after making statements. *Id.* at 119. And was unable to sit in silence. *Id.* Alaniz also reported deep rapid breathing and her carotid artery pulse. *Id.* None of the behaviors identified by Alaniz or observable on the dash camera video indicate Ms. Kyle's nervousness was so extreme as to warrant more than negligible weight in support of reasonable suspicion, even when taken together. Ex. 11 at 18:23:52- 18:38:10.

This Court should find Ms. Kyle's nervousness could not contribute to a basis for reasonable suspicion.

***d) Ms. Kyle's refusal to consent to a search cannot contribute to establishing reasonable suspicion.***

Finally, Ms. Kyle's refusal to allow a search of her vehicle does not contribute to establishing reasonable suspicion. *United States* v. *Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998). To hold otherwise "would make a mockery of the reasonable suspicion and probable cause requirements" as these legal principles would be rendered ineffective if citizens' assertion of these constitutional protections was made a basis for suspicion. *Id*.

This Court should find Ms. Kyle's refusing to consent to a search adds nothing to determining reasonable suspicion.

### *2. Ms. Kyle's statements after Alaniz informed her that she was detained are "fruit of the poisonous tree" that should be suppressed.*

After Alaniz informed Ms. Kyle that she was detained and that he was going to search her vehicle, she admitted to possessing a small amount of marijuana. Ex. 6 at 18:38:39-18:38:40. This statement would not have been made by Ms. Kyle but for the illegal detention. A Fourth Amendment violation cannot be validated by virtue of the evidence it uncovers. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). Ms. Kyle's incriminating statement was made as a direct consequence of illegal detention and therefore should be suppressed. Further, any evidence discovered because of her statement is inadmissible as it is not sufficiently attenuated from the illegal detention to dissipate the taint of the constitutional violation. *Id*. at 487-488.

If this Court finds that the traffic stop was legal at its inception, it should nonetheless find that the stop was completed when Alaniz handed the traffic warning and identification to Ms. Kyle. Having completed the traffic stop, Alaniz lacked authority to detain Ms. Kyle further without probable cause. Alaniz lacked probable cause and therefore the detention of Ms. Kyle to search her vehicle violated the Fourth Amendment.

## III. Alaniz's ALPR database use constituted an unconstitutional search under the Fourth Amendment.

The Fourth Amendment's purpose is "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Chatrie v. United States*, 609 U.S. -- *, 2026 WL 1855568 at *2 (2026) (quoting *Carpenter v. United States*, 585 U.S. 296, 303 (2018)). Guided by the Founders' understanding of privacy, the Supreme Court has "sought to assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted" when considering law enforcement agencies' adoption of advanced

tools of imaging, tracking, and surveillance that have "enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." *Carpenter*, 585 U.S. at 304. (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). The Supreme Court's precedents repeatedly found that the Fourth Amendment "was designed to place obstacles in the way of a too permeating police surveillance." *Chatrie*, 609 U.S. at *9.

The Supreme Court has not addressed whether the use of ALPR databases constitutes a search under the Fourth Amendment, however, the principles applied to similar technologies are instructive here. Historically, courts have held license plates and vehicles on public streets open to public view are not protected by any reasonable privacy right. *See United States v. Knotts*, 460 U.S. 276, 281 (1983); *United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989). *But see United States v. Jones*, 565 U.S. 945, 404 (2012) ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a search.").

The license plate and vehicle being visible to the public is not dispositive here, the search results did more than confirm the identification of the car or the license plate. Instead, the searches disclosed weeks of detailed travel data akin to the historical location data derived from cell-site data considered by the Supreme Court in *Chatrie*.

"A person does not surrender all Fourth Amendment protection by venturing into the public sphere" *Carpenter*, 585 U.S. at 310. "The Fourth Amendment protects people, not places" and this protection extends to persons reasonable expectations of privacy. *Katz v. United States*, 389 U.S. 347, 351 (1967). "[I]ndividuals have a reasonable expectation of privacy in the whole of their physical movements." *Carpenter*, 585 U.S. at 310 (quoting *United States v. Jones*, 565 U.S. 400, 430 (2012)). This individual expectation is reinforced by "society's expectation [ ] that law

enforcement agents and others would not – and indeed, the in the main, simply could not – secretly monitor and catalogue every single movement of an individual's car for a very long period." *Jones*, 565 U.S. at 430. If an individual seeks to keep something private that society recognizes as reasonable to keep private, a governmental intrusion into that private realm generally constitutes a search which requires a warrant supported by probable cause. *Carpenter*, 585 U.S at 304 (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

Before observing any traffic violations, Deputy Alaniz input Ms. Kyle's license plate information into two ALPR systems. Ex. 1, at Bates 117. This report captured the movements of her vehicle over several weeks. *Id*. at Bates 122. These "hits" included locations, dates, times, and direction of the car's travel. *Id*. *See also* Ex. 3 and 4. The results of this search were displayed on Alaniz's patrol vehicle computer as he followed before observing any traffic violations.




*Figure 1: Ex. 5 at 18:19:32.*



*Figure 2: Detail of Ex. 5 at 18:19:32.*

Ms. Kyle has a reasonable expectation of privacy in the location data which tracked her movements over several weeks. The searches conducted by Alaniz violated the Fourth Amendment under current Supreme Court precedents which hold the government intrudes on a constitutionally protected interest when it obtains a party's historical location data. *Chatrie,* 609 U.S at *10.

The ALPR searches here did not simply capture the license plate and description of the vehicle. The search did not merely indicate whether the vehicle had previously been identified in relation to criminal activity. The report generated by Alaniz's searches traced the movements of the vehicle across weeks, multiple states, hundreds of miles, and included details such as specific places and times. These results are analogous to the cell-site records which the Supreme Court considered in *Carpenter*. There the Fourth Amendment was implicated when law enforcement obtained cell-site records because "the time-stamped data provides an intimate window into a person's life, revealing not only his movements, but through them his 'familial, political,

professional, religious, and sexual associations." *Carpenter*, 585 U.S. at 311 (quoting *Jones*, U.S. 565 at 415)). Similarly here, the location data in the ALPR search results provided time-stamped detailed location information over several weeks. This search was conducted without reasonable suspicion, much less probable cause or a warrant.

The Government will likely point to *United States v. Knotts*, 460 U.S. 276 (1983) for the principle that a person on public streets has no reasonable expectation of privacy in his travel from one place to another because he voluntarily conveyed information to any onlookers. However, as the Supreme Court in *Chatrie* noted, the reason the *Knotts*' court found no expectation of privacy was implicated was because the car being tracked was always "in plain view." Although the data collected by various cameras along the way captured Ms. Kyle's vehicle as it moved on public roadways, it is an oversimplification of these systems to assert they are simply providing information "in plain view."

Historical location data of a vehicle is not in "plain view" like the vehicle in *Knotts* where police simply used a beeper to help them follow a suspect from a greater distance over several hours. Until the advent of ALPR technology, law enforcement had few means to track a person's prior movements unless they had physically surveilled that person over that period. Today in executing that surveillance, warrants would have been required for GPS tracking and retrieval of cell-site data. However, Alaniz, acting without probable cause or reasonable suspicion, retrieved Ms. Kyle's detailed historic location data with a few keystrokes. Such surveillance contravenes Ms. Kyle's reasonable expectations of privacy; therefore, the ALPR search violated the Fourth Amendment and all evidence derived from that search should be suppressed.

**1. *Ms. Kyle's reasonable expectation of privacy in her historical location data is recognized by society.***

Ms. Kyle's expectation of privacy in her movements is recognized by society. This

recognition is reflected in public reactions and push back to installation and use of Flock cameras and similar systems. Public outcry about police use of these surveillance systems has resulted in some communities seeking to terminate contracts with companies such as Flock Safety even as the companies expand their reach. Los Angeles is the most recent, and largest, city to rethink its use of Flock Safety due to privacy concerns. Ex. 12. *See also* Ex. 13, 14, and 15.

The public's concerns with the tracking capabilities of ALPR systems are also reflected in Oklahoma's State law. Proposals to expand use of ALPR systems by law enforcement to include the detection of stolen vehicles and matches within the National Crime Information Center have been rejected by the Oklahoma Legislature out of concerns about privacy raised by the collection and use of the ALPR data. Ex. 16. Oklahoma's "Uninsured Vehicle Enforcement Program" law explicitly states "[p]articipating law enforcement agencies may use automatic license plate reader systems utilizing individual automatic license plate reader system units to access and collect data for the investigation, detection, analysis, or enforcement of Oklahoma's Compulsory Insurance Law." Ex. 17, Okla. Stat. tit. 47 § 7-606.1(A). The statute restricts the use of the data from ALPR systems to "enforcement of Oklahoma's Compulsory Insurance Law, Amber Alerts, Silver Alerts or as otherwise permitted by law." *Id.* Since its enactment, all amendments to the law to expand the reach have failed to pass. Ex. 18. Oklahoma courts have also rejected the expansive reading of the statute necessary to permit the search in this case. Ex. 18. While not controlling in the Fourth Amendment analysis, Alaniz's use of the ALPR database search violated Oklahoma state law as enacted at Okla. Stat. tit. 47 § 7-606.1(A). Ex. 18 at 5-6.

Given the public's social and political responses to the increasing deployment and use of ALPR systems, society recognizes Ms. Kyle's privacy interest in her travel history.

**2. *The ALPR search was an unreasonable governmental intrusion of protected privacy rights*.**

Once it is established that the defendant has a reasonable expectation of privacy recognized by society, the next question is whether the law enforcement's actions contravene that expectation. It is unnecessary for this Court to find that the data retrieved from Alaniz's query of ALPR databases was as intrusive as that in *Carpenter* or *Chatrie* to hold that Fourth Amendment applies. The Fourth Amendment "makes no exception for the officer who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." *Chatrie*, 609 U.S. at*13 (quoting *Kyllo*, 533 U.S. at 37). Whether the actions of law enforcement constitute a search does not depend on that was actually found. *Id*. at *14. The monitoring of a vehicle's movements constitutes a search under the Fourth Amendment. *United States v. Jones*, 565 U.S. 400, 404 (2012).

Ms. Kyle has a reasonable expectation of privacy in her historical location data as captured by the ALPR search. Whether that data was as detailed as cell-site data or GPS tracking does not preclude Alaniz's use of the ALPR system from constituting a search under the Fourth Amendment. Here the search tracked her vehicle across multiple states, hundreds of miles, and several weeks. Alaniz's ALPR search constitutes a search under the Fourth Amendment.

This Court may also consider the rapid proliferation and development of these systems' capabilities to track and surveille to determine that use of the ALPR system constitutes a search. *See*, *Kyllo v. United States*, 533 U.S. 27, 36 (2001) ("the rule we adopt must take account of more sophisticated systems that are already in use or in development."). For example, Flock is implementing drones as part of their suite of connected hardware. *See* Ex. 19. The Vehicle Manager system currently has a "geoboundaries" function which identifies and tracks all vehicles

within a geographical area like the geofence search in *Chatrie*.[6] Ex 20. Any gap between the capabilities of these systems and of cell-site data to capture the whole of a person's movements is rapidly being closed by these advancements

**3. *Compliance with internal policy or state law is not decisive under the Fourth Amendment.***

Contrary to the Oklahoma legislature and Oklahoma courts which have rejected attempts to expand the use of ALPR technology by law enforcement, the Tulsa County Sheriff's Office ("TCSO") has adopted a policy of permitting its use "to detect violations of the law, recover stolen property, apprehend fugitives, and investigate crimes." Ex. 21 at 1. Presumably this is predicated on a catch-all reading of Okla. Stat. tit. 47 § 7-606.1(F) which provides that ALPRs are not to be used "for purposes other than enforcement of the Compulsory Insurance Law or as otherwise permitted by law."

However, when considering whether a search and seizure under the Fourth Amendment is reasonable, federal courts are to apply federal law that is "neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed." *United States v. Garcia*, 707 F.3d 1190, 1195 n.2 (10th Cir. 2013)(quoting *Elkins v. United States*, 364 U.S. 206 (1960)); *see also Cooper v. State of California*, 386 U.S. 58, 61 (1967) ("Just as a search authorized by state law may be an unreasonable one under [the Fourth] amendment, so may a search not expressly authorized by state law be justified as a constitutionally reasonable one"). Whether Alaniz followed TCSO policy or Oklahoma law does not resolve the question of whether

[6] In *Chatrie v. United States*, the Supreme Court concluded law enforcement's accessing of cell phone Location History data by means of a "geofence" warrant constituted a search under the Fourth Amendment. A "geofence" warrant seeks information about all the cell phones located in a selected area around a crime scene during a determined timeframe. *Chatrie*, 609 U.S. at *6, *16.

his use of the ALRP search violated the Fourth Amendment.

**IV. Suppression is appropriate because the evidence was obtained in violation of the Fourth Amendment.**

Evidence obtained from a search which violates the Fourth Amendment should be suppressed under the exclusionary rule. *United States v. Salas*, 106 F.4th 1050, 1055, 1062 (10th Cir. 2024) (citing *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014)). Where there is a "causal connection between an illegal seizure and the evidence [the defendant] seeks to suppress" or where "the incriminating evidence would not have come to light but for the illegal seizure," suppression is appropriate. *Id.* at 1062 (quoting *United States v. Shrum*, 908 F.3d 1219, 1233 (10th Cir. 2018)). When the exclusionary rule applies "[i]ts 'sanction applies to any fruits of a constitutional violation,' including 'evidence [that is] tangible, physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity.'" *Id.* at 1055 (citing *United states v. Crews*, 445 U.S. 463, 470 (1980) (internal quotations omitted)).

Exclusion of evidence obtained through unlawful searches is necessary to deter police from violation of constitutional and statutory protections. *Nix v. Williams*, 467 U.S. 431, 442-43 (1984). The Fourth Amendment constitutional protections were violated because the ALPR search was conducted without a warrant, probable cause, or reasonable suspicion; the traffic stop was invalid at its inception because there Ms. Kyle did not violate any traffic laws; and Ms. Kyle was detained after the completion of the traffic stop without reasonable suspicion. Given these constitutional violations, all evidence derived from the detention and search of Ms. Kyle's vehicle should be suppressed. *United States v. Pettit*, 785 F.3d 1374, 1380 (10th Cir. 2015) (stating if an officer unlawfully prolongs a traffic stop, and the officer finds contraband during a search, "the fruits of the subsequent search are inadmissible."); *see also United States v. Sandoval*, 29 F.3d 537, 540 (10th Cir. 1994); *United States v. Frazier*, 30 F.4th 1165, 1180 (10th Cir. 2022) (suppression

appropriate after stop prolonged absent reasonable suspicion). Suppression equally applies to the incriminating statements made by Ms. Kyle regarding her possession of a small amount of marijuana as the statements were the fruits of illegal detention after the completion of the traffic stop. *Wong Sun v. United States*, 371 U.S. 471, 484-486 (1963).

**CONCLUSION**

Wherefore, Ms. Kyle asks this Court to suppress all evidence obtained as a result of these unconstitutional searches and seizures.

Respectfully submitted,

OFFICE OF THE FEDERAL PUBLIC DEFENDER

JULIA L. O'CONNELL, FEDERAL PUBLIC DEFENDER

By: *s / Robert S. Williams*

Robert S. Williams, OBA #19974
ASSISTANT FEDERAL PUBLIC DEFENDER
One West Third Street, Suite 1225
Tulsa, Oklahoma 74103
(918) 581-7656
robert_williams@fd.org
**COUNSEL FOR THE DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of August 2026, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Tyson McCoy, AUSA
Reagan Reininger, AUSA
UNITED STATES ATTORNEYS OFFICE

*s/ Robert S. Williams*
Robert S. Williams,
ASSISTANT FEDERAL PUBLIC DEFENDER