**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 26-CR-189-SEH** |
| **v.** | ) | |
| | ) | |
| **MELISA SUSAN KYLE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS (Dkt. 47)

The Government moves the Court to deny the defendant's motion to suppress as the detention, vehicle search, and statements made by Ms. Kyle were lawfully obtained.

## STATEMENT OF FACTS

On May 10, 2026, Tulsa County Sheriff's Office Deputy Freddie Alaniz was conducting vehicle surveillance on eastbound traffic of Interstate 44 near the 12500 East Avenue block in the City of Tulsa. Deputy Alaniz is an Oklahoma Council on Law Enforcement Education and Training ("CLEET") certified narcotics K9 officer. Deputy Alaniz has served as a police officer since 2008. He has extensive experience in drug interdiction as a CLEET certified narcotics K-9 officer and as a Task Force Officer with the Drug Enforcement Administration. He has conducted thousands of traffic stops and numerous narcotics investigations.

On May 10, 2026, at approximately 6:17 p.m., Deputy Alaniz observed a black Mazda, model CX-50, displaying California license plate number, 9NGC461, traveling eastbound on Interstate 44 in the City of Tulsa. Deputy Alaniz conducted a license plate

reader search of the Mazda's license plate number and learned the vehicle had made a very quick turnaround trip to the western part of the country. Deputy Alaniz knows from his training and experience as a drug trafficking interdiction officer that individuals involved in transporting illegal dugs often make very short round trips to drug source cities in the Western United States.

As Deputy Alaniz drove behind the Mazda, he observed the driver (Kyle) did not give 100 feet of signaling prior to making a lane change. (Ex. 1, 18:19:35-18:19:38)[1]. Deputy Alaniz then observed the driver fail again to give 100 feet of signaling prior to making another lane change. (Ex. 1, 18:19:44 - 18:19:47). Both these actions were violations of Oklahoma Statute § 47-11-309, failing to signal 100 feet before making a lane change.

After observing Ms. Kyle make the traffic violations, Deputy Alaniz observed Ms. Kyle get directly behind a Toyota vehicle with less than a car length of space between her vehicle and the Toyota. (Ex. 1, 18:19:48). Ms. Kyle's vehicle's brake lights also lit up as she was following too closely behind the Toyota. (Ex. 1, 18:19:48). This was a violation of Oklahoma Statute § 47-11-310 (following another vehicle more closely than is reasonable and prudent). Kyle then continued for a short distance and activated her turn signal, then immediately began to change lanes. (Ex. 1, 18:19:54 – 18:19:57). For a third time, Kyle failed to signal 100 feet prior to making the lane change in violation of Oklahoma Statute § 47-11-309.

After observing a total of four traffic violations, Deputy Alaniz activated his emergency lights on his patrol vehicle and conducted a traffic stop of Ms. Kyle's vehicle. (Ex. 1, 18:20:00). Deputy

---

[1] Exhibits 1-3 are Axon video evidence from Deputy Alaniz' patrol vehicle and body cam.
Exhibit 1 is Deputy Alaniz' dash cam video capturing the view directly in front of his patrol vehicle.
Exhibit 2 is Deputy Alaniz' body worn camera video of the traffic stop.
Exhibit 3 is Deputy Alaniz' patrol vehicle interior camera capturing the driver and passenger area of his patrol vehicle. The referenced time stamps correlate to the actual date/time stamps displayed in the upper right hand corner of the recorded videos.

Alaniz then approached Ms. Kyle's vehicle on the passenger side of her vehicle. (Ex. 2, 18:20:32). In plain view, Deputy Alaniz observed the back seats of Ms. Kyle's vehicle were laid down flat with about 4 large suitcases and 1 smaller suitcase. Ms. Kyle was the driver and sole occupant of the vehicle.

When Deputy Alaniz contacted Ms. Kyle, she began telling Deputy Alaniz she was switching lanes because she had to go to Joplin. (Ex. 2, 18:20:40-18:20:50). She stated she was looking at the maps on her phone, which directed her to turn. Deputy Alaniz also observed Ms. Kyle was holding a newly lit cigarette in her left hand inside the car. (Ex. 2, 18:20:44). Deputy Alaniz requested Ms. Kyle to put out the cigarette, which she did. Ms. Kyle then placed the cigarette on the center of dashboard. (Ex. 2, 18: 20: 58-59).

Deputy Alaniz identified himself and advised her the reason for the traffic stop. (Ex. 2, 18:21:05-21). He requested her driver's license, insurance, and vehicle registration. (Ex. 2, 18:21:34-35). Deputy Alaniz also informed her that he would not be writing her a ticket for the traffic violations. (Ex. 2, 18:21:37-40). Ms. Kyle then handed Deputy Alaniz her Missouri driver's license. Ms. Kyle stated she did not have the vehicle registration because the vehicle was a rental car. (Ex. 2, 18:21:55-18:22:09). Ms. Kyle stated she did not know where the rental agreement was located.

Deputy Alaniz then commented to Ms. Kyle that she had a lot of stuff in her car. (Ex. 2, 18:22: 47-48). Ms. Kyle responded that she had a lot of stuff because she went to California for a couple days. (Ex. 2, 18:22: 49-59). Deputy Alaniz also noticed that Ms. Kyle appeared very nervous. Deputy Alaniz could see her hands shaking uncontrollably as she fumbled through the paperwork in the glove box and on the front seat as she looked for the vehicle's rental agreement. Deputy Alaniz also noticed that Ms. Kyle appeared highly stressed and she had very shallow rapid breathing.

Deputy Alaniz asked Ms. Kyle if she had the rental agreement in her email and she responded that she might. Deputy Alaniz then requested Ms. Kyle accompany him to his patrol vehicle where he would be writing her a warning for the traffic violations. (Ex. 2, 18:23:26-18:23:30). Deputy Alaniz also advised her that she could look for the rental agreement on her phone as she sat in his patrol car. Ms. Kyle then accompanied Deputy Alaniz to his patrol vehicle. (Ex. 2, 18:23:44). Ms. Kyle then got into the front passenger seat of Deputy Alaniz' patrol car. Ex. 2, 18:23:51).

As Deputy Alaniz conducted a records check and wrote a traffic warning, Ms. Kyle and Deputy Alaniz engaged in casual conversation. Deputy Alaniz also reviewed the flock license plate reader history for the Mazda CX-50. During their conversation, Kyle confirmed she was just now coming back from California, and she was only there for a couple days. (Ex. 3, 18:24:20-24). Kyle then confirmed that she was going back home to see her kids.

Deputy Alaniz asked Ms. Kyle when she drove to California and she said, "like I said I've been gone for six days." (Ex. 3: 18:24:40) Deputy Alaniz then confirmed with Ms. Kyle that she had been in California for six days. Then Ms. Kyle replied, "yeah, but I only stayed two nights there. Um, it's just an over and back. I haven't seen ay of those people in years." (Ex. 3: 18:24:50). Ms. Kyle went on to state that after her and her husband got separated, she began to move about the country a little bit and had come to the realization she could go places. (Ex. 3: 18:25:00).

Deputy Alaniz asked Ms. Kyle if she remembered what day she left Missouri to drive to California. Ms. Kyle replied, "Yeah. Um Monday, Tuesday, no. I didn't leave until Wednesday. Yeah, I was supposed to leave Monday and with the kids any everything else still I school and all that, I didn't get out until Wednesday." (Ex. 3: 18:25:50 – 18:26:12). As Ms. Kyle spoke with Deputy Alaniz, she continued to take deep breaths. Ms. Kyle was also unable to locate her rental agreement on her phone. (Ex. 3: 18:26:18 – 18:26:26).

Deputy Alaniz asked Ms. Kyle if she took all the luggage in her car with her for the two-day trip. Ms. Kyle responded, "well, yes and no. When I get out there, I tend to like pick up stuff. You know like clothes for the kids and um, I don't know just crap basically and I don't well and I don't get to go very often so I ended up having to buy a suitcase you know while I was out there because it just looks silly all in Wal-Mart bags and all that." (Ex. 3: 18:26:31 – 18:26:50). Ms. Kyle continued to take deep breaths as she was talking to Deputy Alaniz. Deputy Alaniz also noticed that Ms. Kyle at times had rapid breathing. Deputy Alaniz also saw her carotid artery in her neck pulse with each beat of her heart as they talked. Deputy Alaniz also noticed Ms. Kyle would stutter and fail to make eye contact at times during their conversation.

Deputy Alaniz asked Ms. Kyle what she did in California and she responded, "went swimming, I haven't been swimming in years." (Ex. 3, 18:28:42-18:28:48). Ms. Kyle went on to state she visited a cousin who had pet goats and a farm. Deputy Alaniz also confirmed with Ms. Kyle that she was there for just two days. (Ex. 3: 18:29:33-36). Ms. Kyle then discussed how she was no longer with her husband and could now go where she wanted. Ms. Kyle stated she could go out to California for two days now. (Ex. 3, 18:30:09-11) Deputy Alaniz asked Ms. Kyle what she did for a living and she responded, "I buy and sell garage sales" and "flee market type stuff." (Ex. 3, 18:30:42-50). Deputy Alaniz then obtained biographical information from Ms. Kyle and began writing her a warning for the traffic violations.

As Deputy Alaniz was writing the warning, he asked Ms. Kyle where she went in California. Ms. Kyle responded, "Um, well, I like Needles is where I stayed at. Um and then um and Bullhead City, Arizona. I guess it's not really California where my cousin lives, but she lives in that Bullhead City Arizona, kind of around the corner, I guess it's what it is. Seems to me like a big horseshoe. One side is Needles and one side is Bullhead." (Ex. 3: 18:34:50 – 18:35:11).

Deputy Alaniz then issued Ms. Kyle a written warning for failing to give a proper signal and returned her license back to her. (Ex. 3: 18:36:37 – 18:36:50). Deputy Alaniz then asked Ms. Kyle if she had a couple minutes for him to ask her some questions. (Ex. 3, 18:36:55-57). Ms. Kyle responded, "sure."(Ex 3, 18:36:58). Deputy Alaniz informed Ms. Kyle that he worked criminal interdiction on the highways and stated he knew from his training and experience that people who do very short trips to California and come right back are transporting large amounts of drugs… not everybody but some people do. (Ex. 3, 18:37:21-18:37:44). Deputy Alaniz then asked for consent to search Ms. Kyle's vehicle, which she denied. (Ex. 3, 18:37:52).

Deputy Alaniz then informed Ms. Kyle that she was being detained and not free to leave. (Ex. 3, 18:38:04). He also told her that once his backing officer arrived, he would be deploying his K9. (Ex. 3, 18:38:21) Deputy Alaniz advised Ms. Kyle that if his K9 alerted to drugs in the car, it would establish probable cause to search her vehicle. (Ex. 3, 18:38:23-37) Deputy Alaniz also told Ms. Kyle that if his dog did not alert to her vehicle, then she would be free to go. Ms. Kyle then stated, "I know that I got marijuana in there." (Ex. 3, 18:38:38). Deputy Alaniz advised Ms. Kyle it was illegal in Oklahoma unless she had an Oklahoma medical marijuana card. Ms. Kyle then asked, "Can I give you that, because I know he is going to hit on that. It smells horrible. I mean I was just trying to get home with it."(Ex. 3, 18:38:48-18:39:00). Ms. Kyle then went on to state that that's the only thing she got and appeared emotionally upset about the pending dog search. (Ex. 3, 18:39:21-18:39:33). Ms. Kyle asked again if she could just provide the marijuana in her car to Deputy Alaniz because the narcotics dog would hit on marijuana. (Ex. 3, 18:39:40 – 18:39: ). After Deputy Alaniz explained that the marijuana must be medical marijuana to be legal, Ms. Kyle stated she didn't believe the marijuana she had was medical marijuana, then went on to state, "I don't know." (Ex. 3, 18:40:02-18:40:26).

After a backing officer arrived, Deputy Alaniz deployed his CLEET certified narcotics detection K9 to do an open-air sniff of the exterior of Ms. Kyle's rental vehicle. (Ex. 2, 18:46:31). Deputy Alaniz' narcotics detection K9 then alerted to the odor of narcotics coming from the vehicle. (Ex. 2, 18:46:39). Ms. Kyle was then secured in the back seat of a sheriff patrol vehicle. Sheriff deputies also conducted a probable cause search of the vehicle.

Inside the suitcases that were located on the top of the back seats, deputies located numerous large Ziploc bags containing methamphetamine. (Ex. 2, 18:49:12-18:56:50). Inside the vehicle, deputies also located a working digital scale and 3-gallon size Ziploc boxes. On the floorboard behind the driver's seat, deputies located a black locked box with bundled cash totaling $7,000. Deputies also located numerous marijuana vapes and marijuana flower inside the vehicle. Deputies also located an improvised narcotics smoking device and a jar containing a crystal-like substance. The crystal-like substance in the jar tested presumptively positive for methamphetamine in a field test.

After deputies located the narcotics in the vehicle, Drug Enforcement Administration officers arrived on scene and took custody of the methamphetamine. The total weight of the methamphetamine was approximately 90 pounds.

## ANALYSIS

### I. Deputy Alaniz had reasonable suspicion to stop Kyle's vehicle for committing multiple traffic violations.

Traffic stops are subject to the Fourth Amendment's reasonableness requirement. *Rodriguez v. United States*, 575 U.S. 348, 353 (2015). "Because the *Guzman* standard is unworkable, we now adopt a new standard in this circuit for examining the constitutionality of a traffic stop: a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It

is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.' [internal citation omitted]. It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).

"[W]e have held that a law enforcement officer conducting a traffic stop 'may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate. [Internal citation]. In addition, 'an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop.' [internal citation]. However, '[o]nce an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave.' [internal citation]. Thus, '[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."[Internal citation]. *United States v. Kitchell*, 653 F.3d 1206, 1217–18 (10th Cir. 2011) (internal citations omitted).

<u>A. Deputy Alaniz had a reasonable suspicion Ms. Kyle had violated Oklahoma State law by failing to signal 100 feet prior to making a lane change in violation of Oklahoma Statute § 47-11-309.</u>

Oklahoma Statute § 47-11-309 Subsection 2 states the following: "A vehicle shall not be moved from the lane until the driver has first ascertained that the movement can be made with

safety and then given a signal, not less than the last one hundred (100) feet traveled by the vehicle, of his or her intention to change lanes."

In the present case, Deputy Alaniz observed Ms. Kyle fail to signal 100 feet prior to making a lane change as required by Oklahoma Statute § 47-11-309. (Ex. 1, 18:19:35-18:19:37). Deputy Alaniz then observed Ms. Kyle make another lane change without signal 100 feet before making the lane change. (Ex. 1, 18:19: 45 18:19:46). Deputy Alaniz also observed Kyle fail to signal 100 feet prior to making a lane change for a third time. (Ex. 1, 18:19:54 – 18:19:56).

> "Reasonable suspicion requires 'considerably less' than a preponderance of the evidence and 'obviously less' than probable cause to effect an arrest." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). "Because it is a 'less demanding' standard, 'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause.' [Internal citation]. The standard 'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.' [Internal citation]. Courts 'cannot reasonably demand scientific certainty ... where none exists.' [Internal citation]. Rather, they must permit officers to make 'commonsense judgments and inferences about human behavior.' *Kansas v. Glover*, 589 U.S. 376, 380–81, (2020) (internal citations omitted). "Although the government bears the burden of proving the reasonableness of an officer's suspicion, reasonable suspicion is not, and is not meant to be, an onerous standard."
> *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir.2011).

After Deputy Alaniz observed Ms. Kyle fail to signal three times as required under Oklahoma Statute § 47-11-309, he had an *objectively reasonable suspicion* that Ms. Kyle had committed a traffic violation, justifying the traffic stop. In Ms. Kyle's motion to suppress, she argues that the stop was unlawful because according to references to the Federal Highway Administration's Manual on Uniform Traffic Control Devices, Google Maps, Google Earth Pro, physical measurements, and a mathematical calculations, Ms. Kyle traveled more than 100 feet

after signaling and prior to making the lane change.

The law does not require officers to conduct such exacting calculations prior to finding reasonable suspicion exists that a motorist has violated a traffic law. A traffic stop is justified if the officer had an objectively reasonable suspicion that a traffic violation had occurred. Deputy Alaniz had an objectively reasonable suspicion to stop Ms. Kyle when he observed her fail to signal 100 feet prior to making lane changes in violation of Oklahoma law. In Deputy Alaniz dash camera footage, Ms. Kyle's black Mazda CX-50 can be seen in Exhibit 1 at 18:19:35 hours activating the right turn signal and almost immediately changing lanes. In Exhibit 1 at 18:19:44 hours, Ms. Kyle's vehicle can be seen activating the right turn signal and within 2 seconds the vehicle's tires are crossing into the adjacent lane. In Exhibit 1 at 18:19:54 hours, Ms. Kyle's vehicle can be seen activating her left turn signal and beginning to change lanes in Exhibit 1 at 18:19:55 hours. Deputy Alaniz' dash cam video shows there was an objectively reasonable suspicion to find Ms. Kyle had violated the traffic laws three times by failing to signal as required by Oklahoma State law. Deputy Alaniz was not required under the law to make exact mathematical calculations to ascertain with scientific certainty the traffic violation occurred. All that was required under the law was for Deputy Alaniz to have an objectively *reasonable suspicion* that a traffic violation has occurred.

Additionally, the mathematical calculations in Ms. Kyle's motion to suppress are based off the speed of Deputy Alaniz' patrol vehicle, and not Ms. Kyle's vehicle speed. Even assuming the calculations delineated in Ms. Kyle's brief are based upon correct principles, there are genuine questions of factual accuracy given we do not know the exact speed Ms. Kyle's vehicle was moving at the time Deputy Alaniz observed her vehicle. Further, it is unclear how the observed braking of Ms. Kyle's vehicle as she changed lanes would affect such exact mathematical calculations involving time and distance traveled (Exhibit 1, 18:19:43 – 18:19:48).

Given Deputy Alaniz' over 15 years of experience as an officer, including his experience conducting thousands of traffic stops, there is a sufficient factual basis to support Deputy Alaniz' objectively reasonable suspicion that Ms. Kyle violated Oklahoma State law for failing to use her turn signal as required under Oklahoma Statute § 47-11-309.

B. Deputy Alaniz had an objectively reasonable suspicion to conduct a traffic stop of Ms. Kyle's vehicle for following too closely behind another vehicle in violation of Oklahoma Statue § 47-11-310.

Deputy Alaniz also observed Ms. Kyle following too closely behind another vehicle prior to conducting the traffic stop. Following too closely behind another vehicle is a violation of Oklahoma Statute § 47-11-310. Oklahoma Statute § 47-11-310(a) states, "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

After observing Ms. Kyle make two lane change traffic violations, Deputy Alaniz observed Ms. Kyle get directly behind a Toyota with less than a car length of space between her vehicle and the Toyota. (Ex. 1, 18:19:48). Ms. Kyle's vehicle also shows she was applying the brakes as she followed too closely behind the Toyota. (Ex. 1, 18:19:48). This was a violation of Oklahoma Statute § 47-11-310 (following another vehicle more closely than is reasonable and prudent). Accordingly, Deputy Alaniz also had reasonable suspicion to stop Ms. Kyle's vehicle for a violation of Oklahoma Statute § 47-11-310, following too closely.

**II. During the business of the traffic stop, Deputy Alaniz developed reasonable suspicion Ms. Kyle was involved in criminal drug trafficking activity justifying further detention to investigate Ms. Kyle's involvement in a drug crime.**

"It is well-established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings." *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015). "Nonetheless, a 'traffic stop may be

expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Kitchell*, 653 F.3d 1206, 1217–18 (10th Cir. 2011). "Unlike an arrest, which requires probable cause, these brief detentions are constitutional based on the lesser standard of reasonable suspicion: the officer must have 'reasonable suspicion to believe that criminal activity may be afoot.'" [Internal citation omitted]. *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010).

"As courts have repeated, the existence of objectively reasonable suspicion of illegal activity 'does not depend upon any one factor, but on the totality of the circumstances." *United States v. Soto,* 988 F.2d 1548, 1555 (10th Cir.1993).

> In deciding whether the government has met its burden of showing reasonable suspicion, we 'judge the officer's conduct in light of common sense and ordinary human experience,' *United States v. Mendez,* 118 F.3d 1426, 1431 (10th Cir.1997), and we accord deference to an officer's ability to distinguish between innocent and suspicious actions. *Wood,* 106 F.3d at 946; *see also United States v. Lopez–Martinez,* 25 F.3d 1481, 1484 (10th Cir.1994) (observing that deference is owed to police officer's ability to assess suspiciousness of seemingly innocent conduct). Thus, '[t]he evaluation is made from the perspective of the reasonable *officer,* not the reasonable *person.*' *United States v. Guerrero,* 472 F.3d 784, 787 (10th Cir.2007) (emphasis in original)."
>
> *United States v. Simpson*, 609 F.3d 1140, 1146–47 (10th Cir. 2010).

> "The deference owed to the officer's judgment, however, is not unlimited. Even though reasonable suspicion may be founded upon factors consistent with innocent travel, see *United States v. Sokolow*, 490 U.S. 1, 9–10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), '[s]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous.' *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir.1996), overruled on other grounds by *United States v. Holt*, 264 F.3d 1215, 1226 n. 6 (10th Cir.2001) (en banc). Moreover, the officer must point to specific, articulable facts. *United States v. Fernandez*, 18 F.3d 874, 878 (10th Cir.1994). Inchoate suspicions and unparticularized hunches do not provide reasonable suspicion."
>
> *Simpson*, supra, 609 F.3d at 1147.

In the present case, Deputy Alaniz observed several specific and articulable facts while conducting the business of the traffic stop that led him to have an objectively reasonable suspicion that Ms. Kyle was involved in drug trafficking activity, permitting further detention to investigate her involvement in a drug crime.

1. Ms. Kyle's quick turnaround trip to California and explanation for her travels contributed to Deputy Alaniz' reasonable suspicion she was involved in drug trafficking activity.

"An officer may also 'ask questions about the motorist's travel plans and authority to operate the vehicle,' in addition to obtaining the relevant documentation, without exceeding the scope of an investigative detention. [Internal citation]. Such questioning does not violate the Fourth Amendment as long as the questioning does not prolong the traffic stop."[Internal citation]. *United States v. Avezov*, 731 F. Supp. 2d 1194, 1200–01 (N.D. Okla. 2010) (internal citations omitted).

"Implausible travel plans can contribute to reasonable suspicion." (*U.S. v. Santos*, 403 F.3d 1120, 1129 (10th Cir. 2005). "Confusion about details is often an indication that a story is being fabricated on the spot. Mr. Santos volunteered information about his family, but was unable to supply corroborative details ordinarily known to a family member, and he seemed to shift his ground upon close questioning. Other courts have accepted similarly evasive or inconsistent accounts of travel plans as part of the reasonable suspicion calculus." *Id*. at 1131.

"Similarly, the timeline of Mr. Simpson's [defendant] travel plans is relevant. That Mr. Simpson chose to drive a long distance to spend a single night in Reno and could not easily recount when he left or when he planned to return, contributes to a finding of suspiciousness." *Simpson*, supra, 609 F.3d at 1151–52 (10th Cir. 2010).

In the present case, Deputy Alaniz observed via license plate reader information that Ms.

Kyle had made a quick turnaround trip to the western part of the country and was returning back towards Missouri. Ms. Kyle told Deputy Alaniz she was coming from California and had spent two days in California. When questioned about what day she left, she had trouble remembering when she left for her trip despite it just being six days ago. She responded first stating it was Monday, then Tuesday, then Wednesday. As the court found in *Simpson*, Ms. Kyle's inability to recount when she left and the story of her timeline is relevant to a finding of suspiciousness.

Additionally, Ms. Kyle initially told Deputy Alaniz she went to California after being stopped (Ex. 2, 18:22:53-59) and confirmed again she went to California after being seated in the patrol car (Ex. 2, 18:24:18 – 18:24:24). She then was asked what she did in California and gave an explanation that she was swimming and spending time with her cousin. (Ex. 2, 18:28:41 – 18:28:45). It was only after Deputy Alaniz asked her what part of California she went to did she then state she actually went to Bullhead City, Arizona. (Ex. 2, 18:34:48). "Um, well, I like Needles is where I stayed at. Um and then um and Bullhead City, Arizona. I guess it's not really California where my cousin lives, but she lives in that Bullhead City, Arizona, kind of around the corner, I guess it's what it is. Seems to me like a big horseshoe. One side is Needles and one side is Bullhead." (Ex. 3: 18:34:50 – 18:35:11).

The fact Ms. Kyle initially stated she went to California then upon questioning about her exact location in California, she said she was actually visiting her cousin in Arizona, provides additional reason for Deputy Alaniz to suspect Ms. Kyle was not being truthful. When Ms. Kyle was asked what she was doing in California, she first responded, "Swimming." She followed-up that statement, stating she was visiting a cousin who had goats and a farm. The plausibility of Ms. Kyle's story is also a factor courts have found significant in determining whether reasonable suspicion exists. Here, Ms. Kyle's initial response as to why she took such a short trip to California was that she went "swimming." She then added to that story stating she was visiting

family in Arizona. Under the totality of the circumstances, driving halfway across the country to swim is an answer that would cause a reasonable officer to suspect Ms. Kyle was lying. Although Ms. Kyle supplemented her initial response as to why she traveled to California, her initial response when she didn't have time to think was, swimming.

2. Ms. Kyle's use of multiple large suitcases and her explanation for having so many suitcases for such a short trip supported Deputy Alaniz' reasonable suspicion she was involved in drug trafficking.

When Ms. Kyle was asked about why she had so many suitcases in her car when she was traveling alone on such a short trip, Ms. Kyle stated, "well, yes and no. When I get out there, I tend to like pick up stuff. You know like clothes for the kids and um, I don't know just crap basically and I don't well and I don't get to go very often so I ended up having to buy a suitcase you know while I was out there because it just looks silly all in Wal-Mart bags and all that." (Ex. # 3: 18:26:31 – 18:26:50). Ms. Kyle's explanation that she bought a large quantity of items at a Walmart for things like "clothes for the kids," from a store that exists in her home state does not make sense. Additionally, when Ms. Kyle was contacted by Deputy Alaniz, she stated she was going to Joplin. (Ex. 2, 18:20:44 – 18:20: 47). A Google search shows Joplin, Missouri has two Walmart Supercenters and two Walmart Neighborhood Markets[2]. Driving across the country to fill multiple suitcases with items from a store that exists in her home state does not make a lot of sense and provides additional reasonable suspicion she was concealing her true activity.

Additionally, Ms. Kyle's statement that "it just looks silly" to have items in Wal-Mart bags and that's why she bought a suitcase doesn't make much sense given she was traveling back to her home from California. There is no indication anyone would have seen the items in Walmart

---

[2] https://www.google.com/search?q=how+many+walmarts+are+in+joplin+missouri&sca_esv=c22c990d6aa7f981&udm=1&lsack=pyV6apCkFcC3qtsPwI-luA8&sa=X&ved=2ahUKEwjQk7OI5ZaWAxXAm2oFHcBHCfcQjGp6BAgiEAA&biw=1536&bih=695&dpr=1.25

bags given Ms. Kyle's rapid turnaround trip. Her being concerned about it looking "silly" having items in Walmart bags doesn't make a lot of sense given people across the country transport items in plastic bags on a regular basis. Ms. Kyle's explanation about why she had so many suitcases provided additional facts to suspect a reasonable suspicion she was involved in illegal drug trafficking activity.

Further, if Ms. Kyle knew she was going to buy a lot of items for her kids, reason would suggest she would bring an extra suitcase if she was concerned about having items in bags. Regarding picking up items from Walmar, Ms. Kyle stated, "When I get out there, I tend to like pick up stuff. You know like clothes for the kids and um, I don't know just crap basically and I don't well and I don't get to go very often so I ended up having to buy a suitcase you know while I was out there because it just looks silly all in Wal-Mart bags and all that." She stated that when she gets out there, she tends to pick-up stuff for the kids like clothes. However, despite knowing she tends to buy items for the kids, she chose not to bring an extra suitcase with her to store the items, but rather had to buy one when she was out there. This doesn't make sense either. If she tends to buy things for the kids and need more space, why would she wait to buy a suitcase out there instead of bringing an extra one with her.

Further, Ms. Kyle told Deputy Alaniz that she only bought *a suitcase* ("I ended up having to buy a suitcase"), which only explains her reason for having one of the five suitcases. Ms. Kyle had 4 larger suitcases and one smaller suitcase. Even assuming she bought a suitcase to put items in for her kids, she then had 4 additional suitcases in her car for one person making a quick turn-around trip to California. Ms. Kyle's implausible explanation for why she had so much luggage on her short turnaround trip added to Deputy Alaniz' reasonable suspicion she was involved in drug trafficking activity.

3. Ms. Kyle's immediate lighting of a cigarette and holding the lit cigarette inside her vehicle upon being stopped can be reasonably inferred as an attempt to mask the smell of narcotics in her vehicle.

> "The Tenth Circuit has recognized that overwhelming odors may also contribute to reasonable suspicion. *Batara-Molina*, 60 F.4th at 1256 n.2. This is because 'a strong odor may give rise to reasonable suspicion on the part of law enforcement officials that the odor is being used to mask the smell of drugs.' *Id.* at 1256 (quoting *United States v. Salzano*, 158 F.3d 1107, 1114 (10th Cir. 1998)). Voss identified that he could smell the air freshener and the lit cigarette that Murdoch was smoking. Doc. 180 at 30. The credibility of Voss's assertion is bolstered by Trooper Krause's statement after he arrived to conduct the dog sniff that the 'odor of cigarettes and air freshener were overwhelming.' *Id.* at 7. In conjunction with the other factors, Voss's observation contributed to reasonable suspicion."
>
> *United States v. Murdoch*, No. 23-CR-40037-TC, 2025 WL 564195, at *7 (D. Kan. Feb. 20, 2025).

In the present case, when Deputy Alaniz contacted Ms. Kyle, she had a freshly lit cigarette in her left hand and was holding the cigarette inside the vehicle rather than outside her window. (Ex. 2, 18:20:44). Holding a lit cigarette inside a vehicle can help mask the odor of illegal substances that are contained in suitcases. It is significant that rather than hold the lit cigarette outside the window while talking with Deputy Alaniz, Ms. Kyle held the lit cigarette inside the vehicle where it would be better able to mask the smell of narcotics. After Deputy Alaniz asked Ms. Kyle to put out the cigarette, she then placed it on the center of the dash inside the vehicle. Ms. Kyle's actions of lighting a cigarette and holding it inside the car upon being pulled over provide additional factual support that Deputy Alaniz had a reasonable suspicion she was involved in drug trafficking activity and was attempting to mask the smell of narcotics.

4. Ms. Kyle's use of a rental vehicle supports Deputy Alaniz' reasonable suspicion she was involved in drug trafficking.

> "The officer knew from his training and experience that drug couriers often use third-party rental cars. *See, e.g., United States v. Figueroa–Lopez,* 125 F.3d 1241, 1244 (9th Cir.1997) (expert testimony that use

of a rental car was consistent with the practices of an experienced drug trafficker); *United States v. Finke,* 85 F.3d 1275, 1280 (7th Cir.1996) (testimony of officer describing drug courier practices)."

*United States v. Williams*, 271 F.3d 1262, 1270 (10th Cir. 2001).

In the present case, Ms. Kyle was driving a rental vehicle and used the vehicle to make a quick long-distance trip by herself to a known drug source state. Deputy Alaniz is a drug interdiction officer with extensive training and experience in drug trafficking. He knows from his training and experience that rental cars are frequently used by drug traffickers to move drugs across state lines on the highway. Given the totality of the circumstances, Ms. Kyle's use of a rental vehicle is significant when viewed in light of the totality of the circumstances of the stop.

5. Ms. Kyle's persistent nervousness also supports Deputy Alaniz' reasonable suspicion Ms. Kyle was involved in drug trafficking.

> "We have held consistently that nervousness is "of limited significance" in determining whether reasonable suspicion exists [internal citation]. Extreme and continued nervousness, however, "is entitled to somewhat more weight."[internal citation]. Mr. Williams points to *Wood,* where the panel concluded that the officer's testimony as to the defendant's rapid breathing, trembling hands, and throat-clearing constituted a mere "generic claim of nervousness," and therefore discounted the nervousness as a factor in its reasonable suspicion analysis. [internal citation]. In *Wood,* however, the officer and the defendant engaged in casual conversation, including a discussion of the good rate the defendant had received on the rental car. [internal citation]. Thus, *Wood* appears to have involved the more common situation where a citizen exhibits initially "signs of nervousness when confronted by a law officer," [internal citation], but then tends to "settle down" as the traffic stop continues. [internal citation].
>
> In this case, the district court found credible the officer's testimony that Mr. Williams' extreme nervousness did not dissipate throughout the entire stop. Given our standard of review, the record supports the district court's finding that Mr. Williams' nervousness exceeded that of the average citizen during a routine traffic stop. While we do recognize that "[n]ervousness alone cannot support reasonable suspicion of criminal activity," [internal citation] we see no reason in this case to ignore Mr. Williams' nervousness in reviewing the totality of the circumstances.

*United States v. Williams*, 271 F.3d 1262, 1268–69 (10th Cir. 2001)

In the present case, Deputy Alaniz observed Ms. Kyle exhibiting several signs of persistent and extreme nervousness throughout the traffic stop despite telling Ms. Kyle she was only getting a warning for traffic violations. These observations included Ms. Kyle taking deep breaths, shallow rapid breathing, hands shaking uncontrollably, her carotid artery pulse in her neck, and her nervousness was far more nervous than a typical driver being given a warning for a minor traffic violation. Deputy Alaniz told Ms. Kyle shortly after his initial contact with her that he was not writing a ticket for the traffic violations. Despite Deputy Alaniz alleviating any concern that she was getting a ticket, she persisted in showing extremes signs of nervousness during the stop. Deputy Alaniz also noticed that Ms. Kyle would ramble at times and at times would not make eye contact. Ms. Kyle's persistent nervousness in light of such a minor traffic warning are additional relevant facts supporting Deputy Alaniz' reasonable suspicion that Ms. Kyle was involved in drug trafficking activity.

6. Ms. Kyle's unsolicited admission to having marijuana in her vehicle supported her continued detention and reasonable suspicion she was involved in criminal activity.

"Even if a *Miranda* warning has not been given, spontaneous statements made by a suspect that are not in response to any interrogation are admissible." [internal citation]. *United States v. Banegas*, No. 21-CR-0027-CVE, 2021 WL 1316007, at *4 (N.D. Okla. Apr. 8, 2021). After Deputy Alaniz notified Ms. Kyle that he was a drug interdiction officer, Deputy Alaniz asked for permission to search her vehicle. Ms. Kyle then stated she was not granting consent to search her car. Deputy Alaniz then notified Ms. Kyle that she was being detained so that a narcotics detection K-9 could conduct an open-air sniff of her vehicle for narcotics. Ms. Kyle then spontaneously stated she had marijuana in her vehicle. After making this spontaneous

statement, Deputy Alaniz had additional reasonable suspicion to detain Ms. Kyle for a violation of Oklahoma Statute § 21-1220. Oklahoma Statute § 21-1220(2) states in part, "A person operating a motor vehicle on a public highway, street, or alley shall not possess any open container that contains marijuana in the passenger area of the motor vehicle." Ms. Kyle's spontaneous admission to possessing marijuana in her car immediately after being advised she was not free to leave because a drug investigation was being conducted provides additional evidence to support her continued detention by Deputy Alaniz.

7. Ms. Kyle's insistence in providing Deputy Alaniz with the marijuana in her car to avoid a narcotics detection K9 search supports Deputy Alaniz reasonable suspicion Ms. Kyle was involved in drug trafficking activity.

Additionally, after advising Deputy Alaniz she possessed marijuana in her vehicle, she also asked if she could retrieve the marijuana to avoid having the narcotics detection K9 conduct an exterior scan of her vehicle. It is reasonable to infer under the circumstances that Ms. Kyle was actively trying to avoid having a narcotics detection K9 alert to drugs in her car by offering to provide Deputy Alaniz with the marijuana inside her car in order to end the drug investigation. As Ms. Kyle talked with Deputy Alaniz about the marijuana in her car and the pending K9 exterior sniff scan, it appeared that Ms. Kyle became emotional and was on the verge of tears. (Ex. 3, 18:38:45 – 18:39:30). Ms. Kyle's emotional response to a pending narcotics K9 sniff and her attempts to stop it by providing Deputy Alaniz with marijuana from her vehicle provide further evidence she was involved in drug trafficking activity.

In sum, Deputy Alaniz observed all the following facts supporting a reasonable suspicion that Ms. Kyle was involved in illegal drug trafficking activity: (1) A quick turnaround trip to a state known for drug trafficking; (2) A large quantity of suitcases for one person making a short trip to California; (3) Ms. Kyle's difficulty remembering when she left for her trip despite it being less

than a week ago; (4) Ms. Kyle's explanation for the trip; (5) Ms. Kyle stating she went to California then stating she went to Arizona upon further questioning; (6) Ms. Kyle's explanation for why she had so many suitcases; (7) Ms. Kyle's lighting of a cigarette and holding it inside her car which could help mask the smell of narcotics in the car; (8) Ms. Kyle's use of a rental vehicle which is a common practice among drug traffickers; (9) Ms. Kyle's persistent nervousness for such a minor traffic stop where she was advised she was only receiving a warning;

Additionally, after observing all these specific facts, Ms. Kyle admitted to possessing marijuana in her vehicle when she was told a narcotics K9 would be conducting a scan of the exterior of her vehicle. She then tried to stop the impending narcotics K9 scan by offering to provide the marijuana in the car to Deputy Alaniz. She also got emotional when discussing the marijuana in her car while the narcotics scan of the vehicle was pending.

In light of Deputy Alaniz' training and experience as a drug interdiction officer, all these factors provided a reasonable suspicion that Ms. Kyle was involved in drug trafficking and justified the continued detention for the narcotics K9 open air scan of the vehicle.

## III. The search of Ms. Kyle's vehicle was supported by probable cause she was involved in drug trafficking.

Where the police have "probable cause to believe a vehicle contains evidence of criminal activity," they may conduct a warrantless "search of any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 347 (2009). "[P]robable cause is a flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Saulsberry*, 878 F.3d 946, 951 (10th Cir. 2017) (internal citation omitted). Probable cause "does not demand any showing that such a belief be correct or more likely true than false,"

*Brown*, supra, 460 U.S. at 742. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." (*Whren v. United States*, 517 U.S. 806, 813 (1996).

"[A] dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband. We therefore have held in several cases that a dog alert without more gave probable cause for searches and seizures." *United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993).

In the present case, Deputy Alaniz ran his CLEET certified narcotics detection K-9 on the exterior of Ms. Kyle's vehicle prior to the vehicle search. During the exterior sniff test, Deputy Alaniz' narcotics detection K-9 alerted to the odor of a controlled substance coming from the vehicle. After the narcotics detection K-9 alerted to the odor of narcotics coming from the vehicle, deputies conducted a probable cause search of the vehicle. Inside the vehicle, deputies located approximately 90 pounds of methamphetamine, among other items. Accordingly, the search of the vehicle was supported by probable cause given the facts observed by Deputy Alaniz and the confirming K9 alert to the odor of narcotics coming from the vehicle.

**IV. Deputy Alaniz use of license plate reader data obtained in plain view on public roadways did not violate the Fourth Amendment.**

[B]ecause they are in plain view, no privacy interest exists in license plates." *United States v. Walraven*, 892 F.2d 97, 974 (10th Cir. 1989). "A person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983). "[T]he use of a pole camera does not constitute a search if the camera can only capture activity in public view." *United States v. Hay*, 95 F.4th 1304, 1314 (10th Cir. 2024). "[T]hese cameras provide no greater information other than that which is available to the naked eye. . . . [T]he Flock

database simply allows for an efficient review of those exterior images and the information they depict." *United States v. Martin*, 753 F. Supp. 3d 454, 475-76 (E.D. Va. 2024); See also *United States v. Acosta*, No. 25-CR-00239-GKF, 2025 WL 2427700, at *5 (N.D. Okla. Aug. 22, 2025)

In the present case, Ms. Kyle was driving the rental vehicle in plain view on public roadways when her license plate was captured by license plate reader cameras. The location of her vehicle was captured in plain view and was thus not a violation of any Fourth Amendment right to privacy. As the courts have made clear, there is no expectation of privacy in a license plate that is observed in plain view on a public roadway.

**V. <u>State laws regarding the use of automated license plate readers are irrelevant to a Fourth Amendment analysis in federal court.</u>**

> "However, "[i]n determining the reasonableness of a state search or seizure under the Fourth Amendment," the court must "apply federal law." *United States v. Richardson*, 86 F.3d 1537, 1544 (10th Cir. 1996), *abrogated on other grounds as recognized in, United States v. Artez*, 389 F.3d 1106 (10th Cir. 2004)). "The exclusionary rule is only concerned with deterring [federal] Constitutional violations." *United States v. Green*, 178 F.3d 1099, 1105 (10th Cir. 1999) (quoting *United States v. Le*, 173 F.3d 1258, 1264 (10th Cir. 1999)); *see also United States v. Price*, 75 F.3d 1440, 1443-44 (10th Cir. 1996) ("The authority in a federal case for suppressing evidence due to an unlawful search is the Fourth Amendment to the Federal Constitution.). "Thus, 'the fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.' " *Green*, 178 F.3d at 1105 (quoting *Le*, 173 F.3d at 1264); *see also United States v. Mendoza*, 468 F.3d 1256, 1260 (10th Cir. 2006) (quoting *United States v. Bach*, 310 F.3d 1063, 1066 (8th Cir. 2002)) ("[F]ederal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment."); *United States v. Dickerson*, 195 F.3d 1183, 1186-87 (10th Cir. 1999)."

*United States v. Acosta*, No. 25-CR-00239-GKF, 2025 WL 2427700, at *4 (N.D. Okla. Aug. 22, 2025)

In the present case, Ms. Kyle had no Fourth Amendment expectation of privacy in information in her license plate which was open to public view on public roadways. Therefore, there was no Fourth Amendment violation when Deputy Alaniz viewed her license plate information that had been obtained from cameras capturing information on public roadways.

## CONCLUSION

The Government respectfully moves the Court to Deny defendant's motion to suppress.

Respectfully submitted,

CLINTON J. JOHNSON
United States Attorney

*/s/ Tyson McCoy*
Tyson McCoy, CA Bar No. 270782
Assistant United States Attorney
110 W. 7th St., Suite 300
Tulsa, OK 74119-1013
(918) 382-2700

## CERTIFICATE OF SERVICE

I hereby certify that on 10th day of August, 2026, I electronically submitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Robert Williams
*Counsel for Defendant*

*/s/ Tyson McCoy*
Tyson McCoy
Assistant United States Attorn