**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MELISA SUSAN KYLE,**<br><br>**Defendant.** | **Case No. 26-CR-00189-SEH** |

## OPINION AND ORDER

Before the Court is the Defendant's Opposed Motion to Suppress, [ECF No. 47], which the government has responded to, [ECF No. 50]. The Court held an evidentiary hearing on Defendant's motion, during which the Court heard testimony from witnesses and admitted exhibits. The Court also heard arguments from the parties. After considering the record and applicable law, the Court grants the motion for the reasons explained in more detail below.

## I. Background

Tulsa County Deputy Sheriff Freddie Alaniz investigates crimes on the highways in and around Tulsa, Oklahoma. He has experience in drug interdiction, has served as a task force officer with the federal Drug Enforcement Administration ("DEA"), and he is certified by the Oklahoma Council on Law Enforcement Education and Training ("CLEET") as a

narcotics K-9 officer. Alaniz's patrol vehicle is equipped with exterior cameras that record the license plate number of cars that pass him. These cameras feed into larger fixed-position camera networks that automatically capture and log license plate numbers along with accompanying information like the date, time, and location a license plate is seen by one of the cameras in that network. This technology is known as Automated License Plate Reader ("ALPR") technology. Alaniz has access to at least two ALPR systems, Flock and VehicleManager. These two systems have different capabilities, but they serve the same essential function: gathering and organizing historical data about a vehicle's whereabouts on public roadways for use by law enforcement across the country. It is not clear from the record how long such information is kept, nor is it clear who keeps the information. But at least at the time of the incident at issue in this case, Alaniz had access to at least 30 days' worth of vehicle location information in many states, though he did not have access to information from California.

One evening while he was on duty, Alaniz parked his patrol vehicle on the side of the highway to observe traffic passing by. Among other cars, Alaniz saw a Mazda SUV with a California license plate. The Mazda's license plate was picked up by the camera on Alaniz's car. Alaniz then pulled his vehicle onto the highway to follow the Mazda for no apparent reason other than the fact that it had a California license plate. Alaniz also ran a query on the

Flock system for the California license plate number on the Mazda SUV. Both Flock and VehicleManager provide users an option for the reason the query is being run. The reasons Alaniz put in those systems for running the queries were "traffic violation," and "investigation." At the time of those queries, all Alaniz knew was that the vehicle had a California license plate.

After Alaniz ran the ALPR query, he saw that the Mazda made a trip from Locust Grove, Oklahoma, toward the California/Arizona border area, and was heading back to the Missouri area after a short trip. Alaniz testified that the Mazda was in the California area for about one day, but it is somewhat unclear from the record exactly how long the car was there, especially considering Alaniz did not have access to Flock data from California. In any event, the time spent in California was short compared to the time it would take to drive from Missouri and back. Alaniz's bodycam captured the result of Alaniz's ALPR query:




[ECF No. 47-6 at 18:19:32].

When Alaniz followed the Mazda, he believed that he observed two main categories of traffic violations. First, he believed that the Mazda's driver failed to signal a lane change at least 100 feet before making a lane change several times, in violation of 47 O.S. § 11-309. Second, he believed that the Mazda's driver followed a vehicle in front more closely than is safe, in violation of 47 O.S. § 11-310. At least with respect to driving too close to another vehicle, the driver left only about 30 feet between the two vehicles. These traffic maneuvers were captured by Alaniz's dash camera:



[ECF No. 47-5 at 18:19:48].

After pulling the vehicle over, Alaniz approached the passenger side of the car to talk with Defendant Melisa Kyle. Upon making contact, Kyle already had both of the car's front windows rolled all the way down. The interaction began with Kyle appearing to explain that her lane change violations were due to the driving directions on her cell phone. Kyle had also just lit a cigarette moments before Alaniz reached the vehicle, and Alaniz asked her to put it out. Kyle complied, and she did so by first sticking the cigarette out of the driver's-side window to remove the ash, and then she placed it on her dashboard. Alaniz asked Kyle for her license, insurance, and registration, and he informed her that he was not going to write her a ticket. Kyle informed Alaniz that the vehicle was a rental, and that she had gone to

California for a couple of days. Alaniz then invited Kyle to accompany him to his patrol car so she could search for the rental information on her phone.

After getting Kyle into the front passenger seat of his patrol vehicle, Alaniz asked Kyle about her travel plans while he continued to review the ALPR systems for the car she was driving. There are a few main takeaways from this part of the conversation between Alaniz and Kyle:

- Kyle went to California for a couple of days.
- Alaniz asked Kyle when she left for California, and Kyle responded that she had been gone for six days. Kyle further responded that she only stayed for two nights, and that she had not "seen those people in years."
- Kyle explained that when she and her husband separated, she began moving about the country because she realized she "can actually go places."
- Alaniz again asked Kyle about what day she left Missouri for California, and Kyle responded: "Monday [inaudible] … Tuesday, no," and that she did not leave until Wednesday. It is clear from the context of the conversation that Kyle was talking out loud to remember which day of the week she left, not that she was changing her answer.
- Alaniz asked about the amount of luggage she carried for just two days in California, and Kyle responded that she likes to pick up clothes for her kids and "just crap, basically." She explained that she had to buy a suitcase while "out there" because it would look "silly" in Walmart bags.
- Alaniz asked Kyle about what she did in California. Kyle responded that she "went swimming," which she said she had not done in years, that she was just "sitting around bullshitting" and "talking and catching up." She also mentioned that her cousin had goats and a farm.

- Alaniz again pressed Kyle about going so far for such a short trip. Kyle responded that she "hadn't gotten to go anywhere in years" and that "the drive was … as fulfilling as … seeing people." She further explained that her husband was in the military and gone "all the freaking time," and that made her feel like "the dog that got left at the house." But because her children were 15 and 17, Kyle explained that she could go wherever she wanted.

- Alaniz asked Kyle what she did for a living, and Kyle responded that she buys and sells at garage sales and flea markets.

- Alaniz asked what part of California Kyle went to. She responded that she stayed in Needles, and then Bullhead City, Arizona. Kyle explained that she stayed in Needles, but her cousin lived in Bullhead City. She described it as "around the corner," and that "one side's Needles, and one side's Bullhead."

- Alaniz returned Kyle's driver's license and gave her a written warning regarding the traffic violations.

During this portion of the conversation between Alaniz and Kyle while Alaniz was filling out a traffic warning, another law enforcement officer approached Alaniz's vehicle. Alaniz told the other officer, "I think I'm good. I appreciate ya'." Based on the context of this interaction, the Court finds that Alaniz perceived the other officer's presence as an offer to assist, which he refused.

Alaniz then completed the stop by returning Kyle's license to her and giving her a warning. After that was done, Alaniz asked Kyle if she would answer some questions, which Kyle agreed to do. Alaniz told Kyle that he "work[s] criminal interdiction on the highways" and that "we look for uh

people that are uh transporting large amounts of drugs, U.S. currency, guns, uh human trafficking, identity theft stuff." He then told Kyle "your short trip to California I feel like uh—I don't feel—I know from my training … and my experience that people who do very short trips to California and come right back are usually transporting large amounts of drugs." Alaniz asked Kyle for consent to search her vehicle, and she denied the request. Immediately after Kyle refused, Alaniz asked for backup and told Kyle that she was detained so he could have his dog sniff her car.

While Alaniz explained the next steps, Kyle disclosed that she had some marijuana in the car. She asked Alaniz if she could give it to him because she knew that Alaniz's dog would alert to the marijuana. Alaniz stated, "I am not worried at all for a little bit of marijuana, that's not what I'm looking for," but he proceeded with detaining Kyle to deploy his dog for a drug sniff. Alaniz also responded to a radio communication by stating "it's non-pressing, I've just got a refusal on k9 deployment."

After Alaniz's backup officer arrived on the scene, he told him "I asked for consent to search her car, she … denied, so I'm gonna run my dog." Alaniz also told another officer: "Man, she's nervous as all get out. Super nervous. She went to California for two days. … Kinda making some stuff up as I'm asking her where she stayed at. … Has a shit ton of luggage back there for just two days to California. I asked her for consent. She's like 'no I don't think

so.' I said OK, well now you're being detained. … Then suddenly she's got weed in the car." Alaniz's dog then sniffed the car, alerted, and the officers conducted a search of the vehicle, which resulted in Kyle's arrest. While Alaniz searched Kyle's vehicle, he told another officer that he "could see her carotid artery in my car. That thing was about to pop out of her neck," meaning that Alaniz perceived Kyle as being nervous.

## II. Discussion

Kyle challenges three main aspects of her interaction with Alaniz: (1) whether Alaniz was justified in stopping her vehicle; (2) whether Alaniz unlawfully extended the traffic stop; and (3) whether Alaniz's use of the ALPR systems constituted an unlawful search. Kyle asks the Court to "suppress all evidence obtained as a result of these unconstitutional searches and seizures." [ECF No. 47 at 23]. The Court will address each, in turn.

### A. The Traffic Stop was Justified at its Inception.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. This typically requires law enforcement officers to have probable cause before conducting a search or seizure. But there is an exception to this requirement for brief investigatory stops, which are more commonly known as *Terry* stops. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Court "created a limited exception to" the prior general rule

that "any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause." *Florida v. Royer*, 460 U.S. 491, 498 (1983). The Court held in *Terry* that "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Id.*

Traffic stops are analyzed under the same principles that govern *Terry* stops. *United States v. Morales*, 961 F.3d 1086, 1090 (10th Cir. 2020). "A traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Munoz*, 162 F.4th 1210, 1217 (10th Cir. 2025) (quoting *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001)). It is the government's burden to prove "the reasonableness of the officer's suspicion." *Id.* (quoting *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010)). "Ultimately, '[t]he dispositive inquiry is whether state law provided the officer with an objectively justifiable basis for the stop.'" *Id.* (quoting *United States v. Valadez-Valadez*, 525 F.3d 987, 991–92 (10th Cir. 2008)).

Based on the Court's review of the record, Alaniz had an objectively reasonable basis to stop the Mazda for following the car in front of it too closely. 47 O.S. § 11-310(a) provides: "The driver of a motor vehicle shall not

follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." As the assigned investigator from the Federal Public Defender's office testified, Kyle only left approximately 30 feet between the Mazda she was driving and the gold car in front of her. Given Kyle's speed, Alaniz had an objectively reasonable basis to stop the Mazda for a violation of 47 O.S. § 11-310.

**B. Alaniz did not Have Reasonable Suspicion to Extend the Traffic Stop.**

"Once an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *Munoz*, 162 F.4th at 1219 (quoting *United States v. Villa*, 589 F.3d 1334, 1339 (10th Cir. 2009)). "Continued detention is lawful only if the encounter becomes consensual or if, during the initial lawful traffic stop, the officer develops a reasonable suspicion that the detained person is engaged in criminal activity." *Id.* (quoting *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015)). This means the relevant inquiry is whether Alaniz had reasonable suspicion of criminal activity before he returned Kyle's license to her.

Reasonable suspicion is not a demanding standard, but it requires "a 'particularized and objective basis for suspecting' criminal conduct under a

totality of the circumstances." *Id.* (quoting *Pettit*, 785 F.3d at 1379). "This totality of the circumstances 'approach precludes a divide-and-conquer analysis, where the court views each factor that would support reasonable suspicion in isolation.'" *Id.* (quoting *United States v. Latorre*, 893 F.3d 744, 751 (10th Cir. 2018)). The reasonable suspicion standard requires less than a preponderance of the evidence, and certainly less than probable cause. *Id.*

Using the totality of the circumstances approach in the context of traffic stops, "factors consistent with innocent travel may collectively amount to reasonable suspicion." *United States v. Leon*, 80 F.4th 1160, 1165 (10th Cir. 2023). "Given the specialized training and experience that law enforcement officers have, [courts] generally defer to their ability to distinguish between innocent and suspicious behavior, but deference becomes inappropriate 'when an officer relies on a circumstance incorrigibly free of associations with criminal activity.'" *Id.* (quoting *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022)). In other words, an "officer must point to specific, articulable facts. Inchoate suspicions and unparticularized hunches do not provide reasonable suspicion." *Id.* (quoting *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010)). An officer's subjective motives are not relevant to the reasonable suspicion analysis. Rather, the Court must ask whether "the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *United*

*States v. Munoz*, 162 F.4th 1210, 1220 (10th Cir. 2025) (quoting *United States v. Latorre*, 893 F.3d 744, 751 (10th Cir. 2018)).

The government offers six[1] reasons why Alaniz had reasonable suspicion that Kyle was engaging in criminal conduct beyond the observed traffic infractions. [ECF No. 50 at 13–21]. The Court will consider these factors in totality, rather than in isolation, to make a determination about reasonable suspicion. But the Court will independently address each factor in the interest of conducting a thorough analysis, and for purposes of clarity and organization.

**1) <u>Kyle's Quick Turnaround Trip to California and Explanation for her Travels.</u>**

The government points to a few factors that, in its estimation, help establish reasonable suspicion: Kyle's trip to California was very short relative to the time it took to travel there and back; she had trouble remembering when she left; her answers about being in both California and Arizona were suspicious; and her stated purpose of "swimming" and visiting a cousin who had goats and a farm informs the plausibility of Kyle's story.

[1] The government's arguments on exactly what factors contributed to Alaniz's reasonable suspicion are unclear because there are seven subheadings in its brief on this issue (two of which are duplicative). Later on in the brief, the government lists nine factors. Because the government's substantive arguments are organized by the subheadings on pages 13–20 of its brief (rather than the nine factors listed in summary on pages 20–21), the Court will specifically address each of these factors while consolidating the discussion about Kyle's marijuana disclosure for a total of six factors.

The government is correct that, in general, "[i]mplausible travel plans can contribute to reasonable suspicion." *United States v. Frazier*, 30 F.4th 1165, 1177 (10th Cir. 2022) (quoting *United States v. Simpson*, 609 F.3d 1140, 1149 (10th Cir. 2010)). But the Tenth Circuit's instruction "that *suspicious* travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se." *United States v. Santos*, 403 F.3d 1120, 1132 (10th Cir. 2005) (emphasis in original). "[L]ies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion. In contrast, this circuit has been reluctant to deem travel plans implausible—and hence a factor supporting reasonable suspicion—where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make." *Simpson*, 609 F.3d at 1149.

Kyle's short trip to California might not have been something Alaniz would have personally done. But Kyle had a reasonable explanation for the short turnaround—that the drive was as fulfilling as seeing the people she visited. As the Tenth Circuit has recognized, "[t]here is nothing criminal about traveling by car to view scenery." *United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997).

The Court also disagrees with the government's assertion that Kyle could not remember what day she left for her trip. Kyle did state three different

days: Monday, Tuesday, and Wednesday. But when viewing and listening to the video from Alaniz's interior-facing camera, it is apparent that Kyle was talking herself through the days of the week so she could remember what day she left. Kyle responded in the same way many would when asked about, for example, how many items are in their cart when leaving a grocery store (*e.g.* counting out loud and stating: "One, two, three; there are three items in my cart"), or what day they last saw a friend (*e.g.* running through the days out loud to remember and stating: "Monday? No. Tuesday? No. I was with them on Wednesday."). The government's argument on this point might make sense if Kyle's statement was read from a transcript excerpt without the surrounding conversation for context. But the most reasonable interpretation of Kyle's statement based on a common-sense understanding of how people talk in normal conversation leads the Court to conclude that Kyle's statement adds little to nothing to the reasonable suspicion calculus.

The Court also disagrees with the government's assertion that Kyle's statements about being in both California and Arizona were suspicious. Kyle said she stayed in Needles, which was on one side, and that her cousin lived in Bullhead City, which was on another side. Perhaps Kyle could have been clearer, but she was correct that Needles, a city in California, is about 20 miles away from Bullhead City, a city in Arizona, and that they sit on

opposite sides of the Colorado River, which serves as the border between California and Arizona:




Google Maps, Driving Directions from Bullhead City, Arizona, to Needles, California, Last Accessed September 30, 2026.

Kyle's story was also bolstered by the results of Alaniz's ALPR search:




[ECF No. 47-6 at 18:24:50].

The ALPR search result map appears to show Kyle's travel history as being around the Arizona/California border. Because the area around Needles, California and Bullhead City, Arizona sits along the Arizona/California border, this added to the credibility of Kyle's statement.

Finally, the Court disagrees with the government that Kyle's stated purpose for her travel materially adds to the reasonable suspicion analysis. When viewed in the context of Kyle recounting her travels to Alaniz, "swimming" was merely the first thing she told him, it was not the centerpiece of her story. Kyle also explained that she went to visit her cousin who had a farm, and that she had not seen the people she visited in years.

There is nothing suspicious about Kyle visiting family she had not seen in years, and swimming is a normal activity to do with people during a visit. Indeed, visiting family that someone has not seen for years is a good reason to travel a long way over a short time.

Perhaps Kyle was not the best storyteller when she recounted her travel plans for Alaniz, but in the Court's assessment of the evidence, her statements were at most odd. They add little to the reasonable suspicion calculus. Though Alaniz might not have made the same choices, Kyle's travel plans fall within the realm of reasonableness. *United States v. Simpson*, 609 F.3d 1140, 1149 (10th Cir. 2010).

**2) <u>Luggage</u>**

The government focuses on a few issues regarding Kyle's luggage: (1) the number of suitcases in the car for a single passenger on a short trip; (2) Kyle's reason for using suitcases instead of "Walmart" bags; and (3) the fact that Kyle did not bring an extra suitcase with her.

First, the Court is cautious to give too much weight to the number of bags that Kyle had in the car. In some circumstances, "the presence of a bag in a vehicle adds nothing to the reasonable suspicion calculus." *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022) (citing *United States v. Santos*, 403 F.3d 1120, 1124, 1133 (10th Cir. 2005) to note that the Tenth Circuit had previously declined to give any weight to the presence of a new, locked

suitcase in the defendant's truck). Indeed, when contents of a vehicle are consistent with a road trip, such as food wrappers, drink containers, miscellaneous boxes, and clothes, those items might not carry *any* weight in determining whether reasonable suspicion existed. *United States v. Leon*, 80 F.4th 1160, 1167 (10th Cir. 2023). But the amount of luggage for a stated travel plan could potentially raise suspicion. *See United States v. Ledesma*, 447 F.3d 1307, 1318 (10th Cir. 2006) (discussing the amount of luggage as relevant to the level of suspiciousness for stated travel plans). Here, Kyle was travelling alone, and she made a relatively short trip. It would make sense to have a couple bags for such a trip, but Kyle had about a half-dozen with her. But Kyle offered a plausible explanation for the bags—she liked to collect things during her travels. So, although the number of bags in Kyle's vehicle minimally adds to the reasonable suspicion calculus, it does so only slightly.

Second, the government misses the mark with respect to Kyle's statement about using suitcases instead of Walmart bags. When Kyle was explaining to Alaniz why she had so many suitcases, she told him that she liked to pick up clothes for her children and "just crap, basically," indicating that she would pick up things other than items for her children. She further explained that she had to buy a suitcase while "out there" because it would look "silly" in Walmart bags. Contrary to the government's characterization of this issue, the context of the video shows that Kyle referenced "Walmart bags" as a

generic term to reference the type of bag (*i.e.* a plastic grocery-style bag one would find, for example, at Walmart), not that she specifically went to Walmart. Because the Court disagrees with the government's premise on this point, it adds nothing to the reasonable suspicion calculus.

Third, the government also argues that it did not make sense for Kyle to purchase an extra suitcase while traveling instead of bringing one with her. Bringing an extra suitcase would also be a reasonable thing to do, of course. But Kyle would be in good company if she had bought more gifts and miscellany than originally planned while traveling, and the explanation she tendered represents a reasonable, ad hoc, solution to her problem. That the government can identify a more efficient solution to the problem does not add anything to the reasonable suspicion calculus.

The Court agrees that the amount of luggage Kyle had in her vehicle was a little excessive. But the problem for the government is that excessive luggage, while odd, does not necessarily establish reasonable suspicion. The Court acknowledges the deference owed to law enforcement officers based on their training and experience to distinguish "between innocent and suspicious actions." *United States v. Huerta*, 166 F.4th 866, 875 (10th Cir. 2025) (citation and quotation marks omitted). But that deference has limits. Courts cannot allow a law enforcement officer to use training and experience as a blank check to establish reasonable suspicion. *Id.* at 877 (10th Cir. 2025)

(“Although ‘an officer need not rule out the possibility of innocent conduct’ to satisfy the reasonableness standard, ‘there must be a concrete reason to support [the non-innocent] interpretation,’” (citation omitted)); *See Poolaw v. Marcantel*, 565 F.3d 721, 732 (10th Cir. 2009) (noting, in the context of evaluating probable cause for a search warrant, that “an officer’s expertise cannot be invoked to nullify the Supreme Court’s holding that mere propinquity is insufficient to establish probable cause.”) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

While Kyle’s luggage might have been somewhat odd, Alaniz and the government fail to provide a sufficient rationale for why the amount of luggage made it any more likely that Kyle was engaging in criminal activity rather than one of the many lawful reasons someone would have excessive luggage on a cross-country road trip. The closest the government gets to such an explanation is by way of Alaniz’s testimony about his training and experience, and how that made him believe that the facts in this case (*e.g.* a short-turnaround, cross-country road trip with an individual traveler who had excessive luggage) reasonably led him to believe that Kyle was transporting drugs or otherwise engaged in criminal activity. When Alaniz was questioned in more detail about his training and experience, he focused on his conversations with other officers at training conferences, their experiences in such investigations, and his own experience. But that does not

answer *why* or *what about* Alaniz's training and experience, or the information he received from other officers, gave him *reasonable* suspicion *in this case*. Without a reasonable, articulable, concrete explanation, the Court can only give a small amount of weight to Kyle's luggage in the reasonable suspicion calculus.

**3) <u>The Cigarette</u>**

The government argues that because Kyle had just lit a cigarette when Alaniz approached her vehicle, held it inside the vehicle, and put it on her dash after Alaniz asked her to put it out, this is an additional factor that supports a finding of reasonable suspicion.

The Court acknowledges that people sometimes use products like air fresheners and other things to mask the smell of contraband, and that it may support reasonable suspicion. *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022). But there was nothing about Kyle's cigarette use that could reasonably be viewed as suspicious. Cigarettes are notoriously addictive, so it is no surprise that someone who smokes cigarettes would do so when getting pulled over. And after considering the circumstances in this case, Kyle's cigarette smoking fell well within the normal bounds of what smokers do while smoking. The Court gives this factor no weight in the reasonable suspicion analysis.

**4) <u>The Rental Vehicle</u>**

The government argues that Alaniz knew from "his training and experience that rental cars are frequently used by drug traffickers to move drugs across state lines on the highway," thus meaning Kyle's use of a rental vehicle contributes to the reasonable suspicion calculus. [ECF No. 50 at 18]. The Court disagrees. "Generally, the fact that a vehicle has been rented, standing alone, does not add to reasonable suspicion unless there are specific facts that make the rental relevant or unusual." *Frazier*, 30 F.4th at 1177. Like the luggage issue, the government does not point to anything specific about Alaniz's training and experience or specific facts that make Kyle's use of rental car unusual or suspicious in any way. The Court does not give this any weight in the reasonable suspicion calculus.

**5) <u>Nervousness.</u>**

The Tenth Circuit has "consistently held that ordinary nervousness bears little weight in the reasonable suspicion calculus … because most motorists experience some degree of nervousness when stopped by police and 'unless the police officer has had significant knowledge of a person, it is difficult, even for a skilled police officer, to evaluate whether a person is acting normally for them or nervously.'" *United States v. Leon*, 80 F.4th 1160, 1167 (10th Cir. 2023) (citation omitted). However, courts "give somewhat more weight to extreme and persistent nervousness," which is shown by specific

manifestations of such an extreme level of nervousness such as uncontrollable shaking. *Id.* at 1167–68.

The government argues that "Deputy Alaniz observed Ms. Kyle exhibiting several signs of persistent and extreme nervousness throughout the traffic stop," including, "Ms. Kyle taking deep breaths, shallow rapid breathing, hands shaking uncontrollably, her carotid artery pulse in her neck, and her nervousness was far more nervous than a typical driver being given a warning for a minor traffic violation." [ECF No. 50 at 19]. The Court does not doubt that Alaniz perceived Kyle as being more nervous than a typical person. But the Court simply does not perceive anything from the evidence in the record other than Kyle exhibiting an ordinary level of nervousness for a typical encounter with law enforcement during a traffic stop. Kyle was a bit talkative, and her storytelling was somewhat sporadic, but she was generally calm, had appropriate answers to Alaniz's questions, responded in an appropriate manner, and she had no observable shaking or physical manifestations of nervousness that the Court could discern from the record. Therefore, the Court gives Kyle's ordinary nervousness little to no weight in the reasonable suspicion calculus.

**6) <u>The Marijuana Disclosure</u>**

The government finally argues that Kyle's statements about the marijuana in her car provided Alaniz with "additional reasonable suspicion"

to detain her for violations of Oklahoma criminal statutes. [ECF No. 50 at 19–20]. Again, however, the government misses the mark on this front.

"An officer may not prolong [a] traffic stop to conduct an unrelated investigation without reasonable suspicion that the detainee is engaged in criminal activity." *United States v. Leon*, 80 F.4th 1160, 1165 (10th Cir. 2023) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). In the context of a traffic stop, it "must be justified at its inception and the officer's actions must be 'reasonably related in scope' to the 'mission of the stop.'" *Frazier*, 30 F.4th at 1173. Additionally, "an unlawful seizure occurs when an officer (1) diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, (2) in a way that 'prolongs' (i.e., adds time to) the stop, and (3) the investigative detour is unsupported by any independent reasonable suspicion." *Id*. (citation omitted).

"Even de minimis delays caused by unrelated inquiries violate the Fourth Amendment in the absence of reasonable suspicion." *Id*. The moment an officer needs *additional* reasonable suspicion is referred to as the "*Rodriguez* moment." *United States v. Leon*, 80 F.4th 1160, 1165 (10th Cir. 2023). "Facts learned later in the investigation are irrelevant," and "seizure of the individual remains illegal from that point forward." *Frazier*, 30 F.4th at 1179.

Alaniz ended the traffic-based portion of the stop by returning Kyle's license to her. *United States v. Munoz*, 162 F.4th 1210, 1219 (10th Cir. 2025).

Alaniz also made it even more clear that this was the *Rodriguez* moment because he specifically announced that Kyle was being detained. Critically, this happened *before* Kyle made any disclosures about marijuana being in her vehicle. Because Alaniz extended the stop to investigate unrelated drug crimes without reasonable suspicion (for the reasons explained in more detail below under a totality of the circumstances approach), Kyle's seizure became unlawful at that point.

**7) <u>Totality of the Circumstances</u>**

Although the Court has addressed each factor identified by the government individually for purposes of organization and clarity, the Court evaluates the facts under the totality of the circumstances. *United States v. Leon*, 80 F.4th at 1160, 1166 (10th Cir. 2023). At the *Rodriguez* moment in this case, Alaniz knew the following relevant information about Kyle and her travels available to him:

- She made a short trip to California that required a long drive to and from her departure in Missouri over a short period;
- She audibly recounted what day she left for her trip;
- She went swimming on her trip, bought items for her kids and other things, she visited her cousin, and she had not seen the people she visited in years;
- She stayed in a town on one side of the Arizona/California border, and visited someone in a town on the other side of the border;
- She had excessive luggage in her car with a somewhat odd explanation for the amount and type of luggage she used;

- She smoked a cigarette in her car;
- She was driving a rental vehicle; and
- She was nervous, but not extremely or persistently nervous.

In the Court's view, Alaniz did not have enough information to reasonably believe that Kyle was engaged in unlawful conduct. The factors that the government relies upon are the same type of circumstances that everyday Americans encounter on long road trips for many legitimate reasons. Many of us drive longer than we want to get to a desired destination, or to no destination at all other than the road and sights ahead. Many of us lose track of what exact day of the week it is when we are traveling, even if it is for just a moment. Many of us travel for myriad reasons (some better than others), cross state lines, pack too much, buy too much, smoke cigarettes, and rent cars. And many of us even get a bit nervous when talking to law enforcement.

At the end of the day, the unavoidable hole in the record for the government is that it does not tie any of this to a specific, articulable reason why any one or combination of factors gave Alaniz a reasonable basis to believe Kyle engaged in criminal activity. The Tenth Circuit stated it well in *United States v. Leon*:

> The factors cited by the … government are not inconsistent with drug trafficking, but they are also not meaningfully indicative of drug trafficking. Although reasonable suspicion is a low bar, "[t]he articulated factors together must serve to eliminate a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied." This is a close case, but

> we cannot say the factors operate together to eliminate a sufficient portion of innocent travel. "Reliance on the mantra 'the totality of the circumstances' cannot metamorphose these facts into reasonable suspicion."

80 F.4th at 1170. Because the government fails to eliminate a substantial portion of innocent travelers or otherwise provide the Court with a reasonable, articulable explanation why Kyle's conduct indicated criminal activity rather than innocent travel plans, the Court finds that Alaniz's suspicion was "inchoate rather than reasonable." *Id*.

The Court finds a nexus between Alaniz's unlawful extension of the stop after he returned Kyle's license to her and all evidence obtained thereafter. Such evidence would not have been acquired without Alaniz unlawfully extending the stop. Because the government does not identify any applicable exception to the exclusionary rule, the Court finds all evidence recovered as a result of the stop must be suppressed.

**C. <u>Alaniz's use of the ALPR Systems was an Unconstitutional Warrantless Search.</u>**

Kyle also challenges the constitutionality of Alaniz's use of the ALPR systems in his investigation. From Kyle's perspective, she "has a reasonable expectation of privacy in the location data which tracked her movements over several weeks," and the collection and use of that information violated her privacy interest. [ECF No. 47 at 17–18]. More specifically, she argues that her reasonable expectation of privacy in her historical location data is

recognized by society, that the ALPR search was an unreasonable governmental intrusion of protected privacy rights, and that compliance with internal policy or state law is not decisive under the Fourth Amendment. [*Id.* at 18–22]. Based on the alleged Fourth Amendment violation for the ALPR search, Kyle further argues that the evidence derived from her detention and search of her vehicle, as well as her statements about possessing marijuana, should be suppressed as fruit of the poisonous tree. [*Id.* at 22–23].

The government primarily responds to Kyle's argument by noting that the data obtained by ALPR technology is in plain view on public roadways; meaning, Kyle did not have a reasonable expectation of privacy in this information. [ECF No. 50 at 22–23]. The government further argues that Oklahoma law regarding ALPR use is not relevant to the Fourth Amendment analysis. [*Id.* at 23–24].

Neither the Tenth Circuit nor the Supreme Court have decided whether law enforcement's use of ALPR technology is a search for Fourth Amendment purposes. The issue is still working its way through trial and appellate courts across the country. Based on the Court's research, it appears that nearly every court examining the issue to date has determined that ALPR technology use is not a search under the Fourth Amendment because people have no reasonable expectation of privacy in their movements on public streets. Indeed, several other Oklahoma federal courts have decided the issue

this way. *United States v. Schoggins*, No. CR-25-189-JFH, 2026 WL 713083 (E.D. Okla. Jan 28, 2026); *United States v. Brown*, No. CR-25-188-D, 2025 WL 2444596 (W.D. Okla. Aug. 25, 2025); *United States v. Acosta*, No. 25-CR-00239-GKF, 2025 WL 2427700 (N.D. Okla. Aug. 22, 2025). But the Court is concerned that many of these decisions give too much weight to the language in the Supreme Court's decision in *United States v. Knotts*, 460 U.S. 276 (1983), without adequately accounting for the context of ALPR technology and the principles underlying the Supreme Court's more recent decisions on large-scale data collection on an individual's whereabouts.

In *Knotts*, the Supreme Court found that "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." 460 U.S. at 281. But that language exists in the context of the facts presented in the case. Rather than a large-scale, dragnet-type surveillance system like the ALPR technology in this case, the Court in *Knotts* was confronted with much less sophisticated technology. In *Knotts*, a chemical manufacturer notified law enforcement that one of its former employees had stolen chemicals that could be used to manufacture drugs. *Id.* at 278. As a part of the investigation, law enforcement put a "beeper" in one of the chemical containers, and used the beeper to assist in tracking the vehicle that the container was in. *Id.* The Supreme Court determined this was neither a search nor seizure for Fourth

Amendment purposes. But the defendant in that case raised concerns that "the result of the [Court's] holding sought by the government would be that 'twenty-four hour surveillance of any citizen of this country will be possible, without judicial knowledge or supervision.'" *Id.* at 283 (citing Br. For Resp., at 9). The Court addressed the defendant's concern:

> But the fact is that the "reality hardly suggests abuse[;]" if such dragnet type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable. Insofar as respondent's complaint appears to be simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality, and we decline to do so now.

*Id.* at 283–84 (cleaned up).

More than 40 years have passed since the Supreme Court's decision in *Knotts*, and this Court is now faced with technology that appears to be approaching the dragnet type law enforcement practice Mr. Knotts warned of. Therefore, lower courts need to reexamine the result in *Knotts* as technology advances past the rudimentary beeper in that case. Adhering too strictly to the Supreme Court's language in *Knotts* about a person's reasonable expectation of privacy in "his movements from one place to another" risks ignoring the Fourth Amendment principles at stake. *Id.* at 281.

The Court must keep in mind the basic underlying principle that "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). That is why "'[w]hen an individual seeks to preserve something as private and his expectation of privacy is one that society is prepared to recognize as reasonable,' then governmental 'intrusion into that private sphere generally qualifies as a search.'" *Chatrie v. United States*, 609 U.S. ___, 146 S.Ct. 2193, 2204 (2026) (citation omitted).

The Court acknowledges that people, in at least a broad sense, do not have a reasonable expectation of privacy in their movements on a public roadway. *See United States v. Knotts*, 460 U.S. 276, 281–82 (1983). But the rapid development of technology requires courts to take a more nuanced approach than following *Knotts* in a vacuum. The Supreme Court has paid particularly close attention to cell phones, which collect immense amounts of information about people's whereabouts in fine detail. In *Carpenter v. United States*, the Court held that the government's acquisition of cell-cite location records was a search under the Fourth Amendment. 585 U.S. 296, 320 (2018). Certainly, the *Carpenter* majority distinguished cell phones from automobiles: "While individuals regularly leave their vehicles, they compulsively carry cell phones with them all the time. A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id*. at 311. But the

Court nevertheless also pointed out that "[a] majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements." *Id.* at 310.

More recently, the Supreme Court addressed the constitutionality of law enforcement obtaining "geofence" warrants, a tool that allows one to "draw a "geofence"—a virtual perimeter—around the crime scene and get a warrant compelling a company to hand over data about the cell phones located in that area near the time of the crime. Following a process specified in the warrant, the company will turn over the cell-phone data and eventually identify by name one or more of the users thus disclosed." *Chatrie v. United States*, 609 U.S. ___, 146 S.Ct. 2193, 2199 (2026). The majority in *Chatrie* concluded that "the police conducted a search when they gained access to Location History data," and that "[a]n individual has a reasonable expectation of privacy in records about his cell phone's location." *Id.* In reaching its conclusion in *Chatrie*, the Court pointed to its previous decision in *Carpenter*, which noted that "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car." *Id.* at 2207 (quoting *Carpenter*, 585 U.S., at 310). In the Court's view, it is not dispositive that someone's movements occur in public. The underlying principle to take away from *Carpenter* and *Chatrie* is that people "have a reasonable expectation of

privacy in the whole of their physical movements." *Id*. at 2206 (quoting *Carpenter*, 585 U.S., at 310).

The use of the ALPR camera system described by Alaniz in this case credibly invokes concerns raised in both *Carpenter* and *Chatrie*. Alaniz had access to an entire month's worth of location data tied to the license plate on Kyle's car, including more than fifty sightings across multiple states. [ECF No. 50-3]. This is not the same fine-tuned level of detail that something like a cell phone reveals about the whole of someone's physical movements. But by virtue of how ALPR technology works, Alaniz and other officers using these systems have access to a continuously updated location history for *all* vehicles caught on ALPR cameras within the network. This is a type of indiscriminate mass surveillance. It is not targeted on a single individual, as in *Carpenter*. It is a tool that collects information about all vehicles that pass by any network-connected camera at all times, and it serves up the information to law enforcement on demand.

Think about it this way. We might reasonably expect our friends and family to tell us something like: "Hey, I saw you out driving by the store last week." But we do not expect people we know—let alone strangers, and especially not law enforcement—to randomly approach us to say: "Hey, I have been following your car for the last 30 days, and here is a detailed log of every place your vehicle has been with supporting photographic evidence. I am also

going to share this information with law enforcement throughout the country so they know your whereabouts, too." Freedom from persistent, dragnet-style surveillance while in public is not a foreign concept in our society, and it is a reasonable expectation that society already accepts. This is the same expectation of privacy that the Supreme Court has continued to recognize in cases like *Carpenter* and *Chatrie*. Cell phones also move in public places where people can see you in plain view. But it becomes constitutionally problematic when law enforcement can indiscriminately and passively catalog your whereabouts over an extended period of time and then use that information for any purpose whenever convenient.

Here, of course, no *single* vehicle was being followed. Instead, *every* vehicle was being indiscriminately tracked until law enforcement needed information about a particular vehicle driving down an Oklahoma highway with a California plate. The apparent nationwide scale of the ALPR systems Alaniz had access to is concerning enough. But it is also consequential that we are not just dealing with stationary cameras. The cameras on Alaniz's vehicle itself feed information into these systems. It is not difficult to imagine what is next: more cameras on more street signs, buildings, and perhaps on more police cars. It is also no longer difficult to imagine law enforcement using a fleet of drones hovering over an entire city so they don't miss the movement of a single vehicle. This is not hypothetical catastrophizing. The Court "must

take account of more sophisticated systems that are already in use or in development." *Kyllo v. United States*, 533 U.S. 27, 36 (10th Cir. 2001). The Supreme Court echoed this principle in *Carpenter*:

> As Justice Brandeis explained in his famous dissent, the Court is obligated—as "[s]ubtler and more far-reaching means of invading privacy have become available to the Government"—to ensure that the "progress of science" does not erode Fourth Amendment protections. Here the progress of science has afforded law enforcement a powerful new tool to carry out its important responsibilities. At the same time, this tool risks Government encroachment of the sort the Framers, "after consulting the lessons of history," drafted the Fourth Amendment to prevent.

585 U.S. 296, 320 (2018) (citations omitted); *see also Chatrie*, 609 U.S. __, 146 S.C.t 2193, 2207 (2026) ("A new technology should not transform what individuals had reasonably thought they could withhold from the Government.").

To be sure, ALPR technology does not provide the same precision in location information as cell phones. But it could still reveal a lot about a person's whereabouts, and it is easy to imagine the kinds of sensitive information it collects. It could track and log a couple struggling to start a family at the fertility clinic. It could show how often someone visits a liquor store or casino. It could show which doctor someone goes to or what lawyer's office someone visits. It also collects mundane information about people's commutes, but it collects a tremendous amount of such information all the time. It is possible that a dedicated team of law enforcement officers could

constitutionally collect this information about one car—and its driver—by following that vehicle on public roadways over a month. But this leaves the question of why is it the government's business where *everyone* goes *all the time*? The government cannot go snooping through our personal lives and business without an adequate basis to do so. That is what the Supreme Court has said since its decision in *Katz* through its decision in *Chatrie* this year, nearly sixty years later. It is not too much to draw the line at indiscriminate mass surveillance.

No doubt, ALPR technology comes with remarkable benefits that the Court cannot ignore. But the Fourth Amendment requires courts to draw a line when the cost is too great. Alaniz's search in just the ALPR system provided him with more than 50 individual records of Kyle's whereabouts across the country for an entire month. The Court finds that because the ALPR systems Alaniz used to search Kyle's historical location information intruded on her reasonable expectation of privacy in the whole of her physical movements, it was a search under the Fourth Amendment. Based on the information in the record, the only reason Alaniz conducted that search was because he saw her license plate was from California. That search was not supported by probable cause, and it was done without a warrant in violation of Kyle's Fourth Amendment rights. That search also has a nexus to the remainder of the traffic stop because Alaniz began following Kyle's car while

he conducted the ALPR search, which led to the rest of the evidence obtained during the traffic stop. Because the government does not identify any adequate exception to the exclusionary rule, all evidence obtained after Alaniz initiated the ALPR search must be suppressed as fruit of the poisonous tree.

## III. Conclusion

IT IS THEREFORE ORDERED that the Defendant's Opposed Motion to Suppress [ECF No. 47] is GRANTED for the reasons explained above.

DATED this 1st day of October, 2026.

Sara Hill

Sara E. Hill
UNITED STATES DISTRICT JUDGE